RECTOR, CHURCH WARDENS AND VESTRYMEN OF ST. BARTHOLOMEW'S CHURCH, Appellant, v COMMITTEE TO PRESERVE ST. BARTHOLOMEW'S CHURCH, INC., et al., Respondents.

First Department, January 14, 1982

### APPEARANCES OF COUNSEL

*Charles E. Dropkin* of counsel (*Andrew J. Connick* with him on the brief; *Milbank, Tweed, Hadley & McCloy,* attorneys), for appellant.

*Gerald D. Fischer* of counsel (*Lefrak Fischer & Myerson,* attorneys), for respondents.

SULLIVAN, J.

This controversy arises out of an article which appeared on the front page of the *New York Times* on September 19, 1980, reporting that "[a]n unidentified 'very prestigious American corporation'" had offered St. Bartholomew's Protestant Episcopal Church $100,000,000 for the church and the land on which it stands, and that a "spokesman for the church said that it was seriously considering the offer."[1] According to the article the church, which is located on Park Avenue, between 50th and 51st Streets, "might be demolished to make way for an office building." St. Bartholomew's Church is a New York City architectural and historic landmark and edifice of enormous cultural significance. Opposition to such a sale and the possible concomitant destruction of the church began to emerge immediately and coalesced in the formation of the Committee to Preserve St. Bartholomew's Church, Inc.

Approximately three weeks later, on October 9, 1980, at a meeting held by the vestry with the parishioners to discuss the possibility of selling all or a part of the church's property, it was announced that the church, in an effort to ease its growing financial burden, would favorably consider a sale or lease of a substantial portion of its property, including the garden, terrace and community house, as well as the air rights over the entire property. Notwithstanding the rector's assurances that a disposition of the church's real property would not be made without a vote of the membership,[2] defendant J. Sinclair Armstrong, a long-standing church member, submitted a resolution at this meeting to amend section 5 of article 4 of the church's by-laws to require a majority vote of the church's members

---

1. On May 3, 1981, after the commencement of this action, a *New York Times* article reported an offer by a real estate developer to construct a 26-story building on a portion of the church property. The structure would be set back 56 feet from Park Avenue and then cantilevered about 60 feet over the existing garden, thereby limiting any interference with the view "of the landmark church."

2. On September 8, 1981, while the motion which is the subject of this appeal was pending, the vestry reconfirmed that church members would vote on a forthcoming proposal for disposition of air rights and certain real property, other than the church building. A referendum was held on December 18, 1981 and an appeal therefrom is currently before this court.

approving any sale or other disposition of church realty. The proposed by-law amendment read as follows: "Subject to the provisions of the final sentence of this paragraph, the Vestry shall have general charge of the affairs, funds, and property of the Church. The Vestry shall have full power and shall carry out the purposes of the Church as stated in the Charter and Constitution. A majority of the Vestry members shall constitute a quorum. However, the Vestry shall not undertake the sale or other disposition of real property owned by Church, nor request approval of the Supreme Court for any such sale or disposition, without the affirmative vote of a majority of Church members present at an annual meeting or a special meeting called by the Vestry for the purpose of taking such a vote."

At the next meeting of the vestry, on January 13, 1981, the church, on advice of counsel, refused to move the resolution to a vote on the ground that the proffered amendment of the by-laws had been improperly presented. This refusal is the focal point of this appeal.

In December, 1980, after the establishment of the committee, the church commenced this action against it and five individuals including Armstrong, its chairman, to enjoin them from using the name Committee to Preserve St. Bartholomew's Church, Inc. (or Committee for the Preservation of St. Bartholomew's Church), and from soliciting for the maintenance, support or preservation of St. Bartholomew's Church under that name, and to impress a constructive trust on moneys received by the committee pursuant to alleged misleading solicitation practices. Defendants were enjoined from using the name and claiming in their solicitations any association with the church. With the church's consent defendants were permitted to adopt the name Committee In Opposition to the Sale of St. Bartholomew's Church, Inc., thereby disposing of the cause of action for injunctive relief.

In their answer defendants asserted two counterclaims, the first for the impression of a trust on funds allegedly intended for the committee but misdirected to the church (a mirror of the church's remaining cause of action), and the second for an order to require the church to convene a special meeting to vote on the proposed amendment to the

corporate by-laws. Defendants thereafter moved for, *inter alia,* summary judgment on the second counterclaim. Special Term denied the church's cross motion for summary judgment dismissing the second counterclaim and granted defendants' motion for summary judgment, directed the church to convene a special meeting of its members to vote on the proposed by-law amendment, and preliminarily enjoined the church from consummating any sale or lease of its real property. The church has appealed from both the judgment entered thereon and an order denying its motion for renewal and reargument.[3]

Because the church's charter and by-laws do not contain a provision for convening a special meeting to vote on a member-proposed amendment to the by-laws, the right of a member to place such an amendment before the membership must necessarily be derived from statute. The church contends that the right of the membership of a not-for-profit corporation, such as a church, to call a special meeting of members to act on a specific matter is controlled by subdivision (c) of section 603 of the Not-For-Profit Corporation Law which provides in pertinent part: "Special meetings *** may be convened by the *members entitled to cast ten per cent of the total number of votes entitled to be cast at such meeting, who may, in writing, demand the call of a special meeting* specifying the date and month thereof *** [U]pon receiving [this] written demand [the corporation] shall promptly give notice of such meeting" (emphasis added).

■ Defendants argue that the statutory right to compel a special parish meeting is found in section 5 of the Religious Corporations Law, which provides that the by-laws of a religious corporation may be amended by a two-thirds vote of the qualified voters at a meeting "after written notice, embodying [the] *** amendment, has been openly given at a previous meeting".[4] Special Term found the two stat-

---

3. In moving for renewal the church argued, *inter alia,* that the second counterclaim was moot in light of its September 8, 1981 declaration that the membership would be granted the right to vote on any forthcoming proposal for the disposition of air rights and any part of the church property.

4. Section 5 of the Religious Corporations Law provides: "By-laws may be adopted or amended, by a two-thirds vote of the qualified voters present and voting at the meeting for incorporation or at any subsequent meeting, after written notice, embodying such by-laws or amendment, has been openly given at a previous meeting".

utes to be in conflict with each other and determined that section 5 of the Religious Corporations Law controlled. This was error. We believe that subdivision (c) of section 603 of the Not-For-Profit Corporation Law and section 5 of the Religious Corporations Law should be read *in pari materia* so as to complement each other.

Section 5 of the Religious Corporations Law merely addresses itself to the percentage of voters required to enact or amend a by-law and recognizes a right of members to propose by-law amendments, upon proper notice, but it makes no provision for convening a special meeting of parishioners to vote on the actual proposal. The statutory right to compel church officials to convene a special parish meeting is found in subdivision (c) of section 603 of the Not-For-Profit Corporation Law, which requires that upon receipt of a written demand by 10% of the eligible member-voters, a corporate officer shall give notice of a special meeting on the date and month specified by the proposers. Thus, subdivision (c) of section 603 provides the statutory mechanism to implement the "written notice" requirement of section 5 of the Religious Corporations Law and the two statutes, rather than being in conflict, are compatible. Strict compliance with one does not stifle adherence to the other. When two statutes are *in pari materia* "they must be read together and applied harmoniously and consistently." (*Matter of Guardian Life Ins. Co. of Amer. v Chapman*, 302 NY 226, 231; see, also, McKinney's Cons Laws of NY, Book 1, Statutes, § 221, subd b.) If by fair construction, two statutes can be given operation, implied repeal of one by the enactment of the other will not be declared. (*Cimo v State of New York*, 306 NY 143, 148-149, and cases cited therein.)

In arguing that such an interpretation is "contrary to the explicit language of the Religious Corporations Law and contrary to the expressed legislative intent" and would improperly "read into the Religious Corporations Law the 10% requirement of the Not-For-Profit Corporation Law", defendants rely, as did Special Term, upon section 2-b (subd 1, par [a]) of the Religious Corporations Law which provides: "If any provision of the not-for-profit corporation law conflicts with any provision of this chapter, the provi-

sion of this chapter shall prevail and the conflicting provision of the not-for-profit corporation law shall not apply in such case."

As the extensive legislative history of section 2-b of the Religious Corporations Law clearly demonstrates, however, the Legislature intended the Not-For-Profit Corporation Law to be controlling with respect to religious corporations, with the provisions of the Religious Corporations Law taking precedence only in cases of clear and unavoidable conflict between the two statutes. (See Fourteenth Interim Report of Joint Legislative Committee to Study Revision of Corporation Laws, NY Legis Doc, 1970, No. 11, Appendix 13, pp 81-96; Fifteenth Interim Report, NY Legis Doc, 1971, No. 10, pp 22-25 and Appendix 21, pp 98-100; Sixteenth Interim Report, NY Legis Doc, 1972, No. 11, pp 17-19.) Any doubt as to the pre-eminence of the Not-For-Profit Corporation Law is dispelled by reference to the explanatory memorandum which accompanied the bill enacting section 2-b of the Religious Corporations Law: "The purpose of this bill is to substitute the Not-For-Profit Corporation Law in place of the General Corporation Law *as the foundation statute upon which the Religious Corporation Law rests*" (reprinted in Fifteenth Interim Report of Joint Legislative Committee to Study Revision of Correction Laws, Legis Doc, 1971, No. 10, Appendix 21, p 100; emphasis supplied).

Thus, all of the provisions of the Not-For-Profit Corporation Law are applicable to church organizations except in instances where the Religious Corporations Law contains a provision in direct conflict with the Not-For-Profit Corporation Law, in which event section 2-b of the former would apply to override the Not-For-Profit Corporation Law. Commentators who have analyzed the interplay of both statutes have concluded that the Not-For-Profit Corporation Law is applicable when a member of a religious corporation seeks to convene a special meeting: "Meetings of religious corporations are called according to their constitutions and by-laws, if there is no statute upon the matter, the Business Corporation Laws being not generally applicable. The Nonprofit Corporation Act which generally applies to religious corporations * * * specifically

authorizes the calling of a special meeting of the members either by the president or the board of directors, or by such other officers, persons or members as may be provided in the articles or by-laws. In the absence of such provision, *a special meeting may be called by the members having a prescribed percentage of the votes entitled to be cast at such meeting.*" (5 Fletcher, Cyclopedia of Corporations [1976 rev], § 1997, p 11, emphasis supplied; accord 6 White, New York Corporations [13th ed], par 603.02; 6 Cavitch, Business Organizations, § 117.04, n 9.)

The 10% requirement prescribed in subdivision c of section 603, is not limited to not-for-profit corporations (of which the church is one); it also appears in section 603 of the New York Business Corporation Law. Indeed, the great majority of jurisdictions require that special meetings be called by the holders of not less than a specified proportion of voting shares.[5] (See 6 Cavitch, Business Organizations, § 117.04, subd [1], n 11.) The rule has a salutory purpose. It takes into account one of the realities of internal corporate management, for without it a single dissident could monopolize a corporate meeting by proposing a litany of by-law amendments, thereby impeding the corporate officers from discharging their statutory duties. If a corporate board of directors or, in the case of a religious organization, the vestry, could be forced to convene a special meeting by a single stockholder or church member, then its ability to maintain reasonable control over its decision-making processes would be seriously eroded.

Since other not-for-profit corporations are not statutorily compelled by New York law to convene special meetings at the behest of a sole dissident, to single out churches as the exception to the rule would necessarily impose upon them a greater restriction on their ability to control their own affairs than is imposed upon other corporations, a highly undesirable result given the constitutional sensitivity of church-State relationships. It is axiomatic that statutes

---

5. E.G., Alabama (10%), Alaska (10%), Arkansas (10%), California (20%), Colorado (10%), District of Columbia (20%), Florida (10%), Illinois (20%), Indiana (25%), Iowa (10%), Kansas (20%), Michigan (10%), Mississippi (10%), Missouri (20%), Nebraska (10%), New Mexico (10%), North Carolina (10%), North Dakota (10%), Ohio (25%), Oklahoma (25%), Oregon (10%), Pennsylvania (20%), South Carolina (10%), South Dakota (10%), Texas (10%), Utah (10%), Virginia (10%), Washington (10%), West Virginia (10%), Wisconsin (10%), and Wyoming (10%).

are to be construed, *inter se,* so as to avoid constitutional conflict. (See *Hirson v United Stores Corp.,* 263 App Div 646, 650, affd 289 NY 564; see, generally, *Kauffman & Sons Saddlery Co. v Miller,* 298 NY 38.) "[N]o purpose of action against religion can be imputed to any legislation, state or national". (*Holy Trinity Church v United States,* 143 US 457, 465.) By finding conflict between subdivision (c) of section 603 of the Not-For-Profit Corporation Law and section 5 of the Religious Corporations Law and interpreting the statutes so that section 5 controlled, Special Term chose that form of statutory construction which imposes the greater burden upon the ability of the church to conduct its internal affairs.

Since the resolution proposing the by-law amendment was not submitted in conformity with subdivision (c) of section 603 of the Not-For-Profit Corporation Law, Special Term should not have directed the church to convene a special meeting to vote on the proposed amendment and the church's cross motion for summary judgment dismissing the second counterclaim which sought such relief should have been granted. Nor should the church have been enjoined from consummating any sale or lease of its real property, since defendants failed to show that their rights were in imminent danger of being irreparably harmed. (See *People v Canal Bd. of State of N. Y.,* 55 NY 390, 395; *1130 President St. Corp. v Bolton Realty Corp.,* 300 NY 63, 69.)

■ Finally, the church's motion to renew and reargue was improperly characterized by Special Term as a motion for reargument since the church presented new facts, viz., the vestry's determination on September 8, 1981 to grant the parishioners a vote on a forthcoming proposal for disposition of air rights and a certain portion of the church's realty, other than the church building. Although this new circumstance did not render the earlier determination academic, as the church argued, because the vestry's concession would not bind the church beyond the forthcoming proposal nor effect an amendment of the by-laws, the denial of the motion is appealable, inasmuch as the motion was indeed, in part, an application to renew as

well as to reargue (7 Weinstein-Korn-Miller, NY Civ Prac, par 5701.24).

Accordingly, the appeal from the judgment, Supreme Court, New York County (WHITMAN, J.), entered October 19, 1981, which, *inter alia,* granted summary judgment to defendants on the second counterclaim, should be dismissed, on the law, without costs or disbursements, as academic. The order of the same court, entered October 19, 1981, denying the church's motion for reargument and renewal, should be reversed, on the law, without costs or disbursements, the motion granted, and upon renewal, defendants' motion for summary judgment on the second counterclaim and for injunctive relief denied, the injunction against the church dissolved and the church's cross motion for summary judgment dismissing the second counterclaim granted.

MURPHY, P. J., BIRNS, LUPIANO and BLOOM, JJ., concur.

Order, Supreme Court, New York County, entered on October 19, 1981, unanimously reversed, on the law, without costs and without disbursements, the motion granted, and upon renewal, defendants' motion for summary judgment on the second counterclaim and for injunctive relief denied, the injunction against the church dissolved and the church's cross motion for summary judgment dismissing the second counterclaim granted. The appeal from the judgment of said court, entered on October 19, 1981, is unanimously dismissed, on the law, without costs and without disbursements, as academic.