■ ROBERT E. MORRIS, JR., et al., Appellants, v CHARLES SCRIBNER, JR., et al., Respondents.—Order of the Supreme Court, New York County (Kenneth Shorter, J.), entered January 9, 1986, which, *inter alia,* denied plaintiffs' motion for a preliminary injunction and granted defendants' cross motion for summary judgment dismissing the amended complaint, is modified, on the law and facts and in the exercise of discretion, to the extent of granting plaintiffs' motion for a preliminary injunction and granting plaintiffs summary judgment on the first cause of action to the extent of declaring that, under article IV, section 5 of the church's bylaws, defendants lack authority to expend church funds on real estate development of the property herein without the approval of a majority of the qualified voters voting at an annual or a special meeting

called by the vestry, denying defendants' cross motion for summary judgment on the first cause of action, and is otherwise affirmed, without costs or disbursements.

The bylaws adopted here forbid the vestry to "undertake the sale, mortgage, lease or other disposition of all or any part of the real property owned by the Church". The 1983 contract, which the vestry nevertheless entered, is an *undertaking* designed to dispose of real property, which was not submitted to the parishioners for an affirmative vote, as required by these amended bylaws. That contract imposes an outlay of large sums of money, as well as a contingent liability for other expenditures by the church, in order to fulfill the terms of the agreement. It appears that over $1,000,000 has been spent by the church to date in compliance with the contract. Significantly, the terms of this agreement were never submitted to the parish for its consideration and vote. Concur—Asch, Kassal and Rosenberger, JJ.

Sandler, J. P., and Wallach, J., concur in a memorandum by Wallach, J., as follows:

It is not often that a court can be induced to intrude upon the managerial prerogatives of the trustees of a church, particularly at the behest of a miniscule minority of the church membership. But, where the trustees have departed from a church bylaw prohibiting the expenditure of church assets on a real estate venture unless authorized by a majority vote of the church membership, injunctive relief restraining further expenditures and compelling a meeting of the membership for the purpose of taking such a vote is warranted.

Defendants are the trustees of a religious corporation of the Protestant Episcopal faith, i.e., the rector, church wardens and vestrymen of their church; plaintiffs are a group of parishioners numbering less than 1% of the church membership. Defendants desire to develop real estate owned by the church by entering into a long-term lease with a developer who would construct an office tower on church property in close proximity to the church building. A project such as defendants are planning requires the approvals of various municipal agencies prior to the commencement of construction. One such agency, should the property under development be designated a landmark, as it is here, is the Landmarks Preservation Commission, whose certificate of appropriateness permitting alteration of a landmark site defendants have not been able to obtain despite repeated efforts.

Adopting the nomenclature used by the parties to describe

the proceedings before the Landmarks Preservation Commission, the process of "decertifying" property as a landmark appears to require a detailed presentation of project plans to the Commission *(see, Church of St. Paul & St. Andrew v Barwick,* 67 NY2d 510). This, in turn, necessitates the services of attorneys, accountants, engineers, architects and real estate advisors, as well as a fairly firm understanding with the developer on all essential aspects of the project. The exact amount defendants have spent on decertification is difficult to ascertain on this record, but defendants themselves characterize the process as protracted and complex. Plaintiffs assert that, in all, approximately $2 million has been spent, and $500,000 incurred in contingent liabilities, for real estate development since 1981, and that defendants are continuing to incur legal fees at the rate of $10,000 a month. Defendants concede none of this, but neither do they have much to say about the extent of the expenditures other than that a "substantial portion" of the amount included in plaintiffs' reckoning was incurred in defending against nettlesome "legal maneuvers" brought by small factions of the membership to thwart the project. Whatever the breakdown of expenses incurred as between internecine litigation and real estate development, defendants appear intent on exhausting their remedies against the Commission, and substantial additional sums are certain to be spent on that endeavor. Litigation had not yet been instituted when plaintiffs made this motion for a preliminary injunction against further expenditures, but that was no longer the case by the time of oral argument. There was some discussion on oral argument as to whether defendants might not be under a contractual commitment to the developer to take their case against the Commission all the way to the Supreme Court of the United States.

Three separate applications were made by defendants to the Commission, and all were denied. Rejection required the reopening of negotiations with the developer, and defendants acknowledge that the project presently planned, with respect to both the dimensions of the building and the amount and timing of the payments to be made by the developer, is not anything like a proposal that was approved by a small majority of the membership in a 1981 vote. (The vote was 374 to 353 in favor of the proposal.) Concerning the landmark designation, the biggest difference is that the 1981 plan called for a large payment by the developer to the church upon the signing of a lease prior to decertification, the intent being to place the risk posed by the landmark designation primarily on

the developer. Under the new arrangement with the developer, denominated a contract to lease, lease execution is made contingent upon decertification, so that the risk of failure in the decertification proceedings is placed primarily on the church.

Plaintiffs view the project as real estate wheeling and dealing, unworthy of an institution whose purpose is "to enable its members to meet for divine worship or other religious observances" (Religious Corporations Law § 2). With this perspective, they perceive a violation of Religious Corporations Law § 5, which, in vesting the trustees of a religious corporation with "custody and control of all the temporalities and property, real and personal" belonging to the corporation, requires such to be administered for the corporation's "support and maintenance". There is a difference, argue plaintiffs, between making expenditures for repairs, alterations and improvements, and putting up a large office building involving a 100-year lease with hardly a speculative chance of overcoming even the first hurdle posed by the landmark designation. Defendants contend that the statute creates no such distinction, and that, since their object is to improve the financial condition of the church, the expenditures have been for the church's support and maintenance within the meaning of the statute. They view the expenditures as a sound investment of church funds, which will begin to realize a return as soon as there is a lease.

Plaintiffs' argument that defendants are acting ultra vires in violation of Religious Corporations Law §§ 2 and 5 is of no merit. It challenges defendants' incontestable right as trustees of the church to alienate church property (*Wyatt v Benson,* 23 Barb 327; *Matter of Minister of Ref. Dutch Church,* 16 Barb 237, 240-242; *Bowen v Trustees of Irish Presbyt. Congregation,* 6 Bosw 245, 265-267). Concerning the power of alienation, the only difference between a religious corporation and any other corporation is that a conveyance of the real property of a religious corporation cannot be effective without the consent of the court (*Congregation Beth Elohim v Central Presbyt. Church,* 10 Abb Prac [NS] 484, 488; *Church of God v Fourth Church,* 54 NY2d 742, *affg* 76 AD2d 712). This requirement, found in Religious Corporations Law § 12, does not restrain the making of a contract as a preliminary step towards a conveyance (*Congregation Beth Elohim v Central Presbyt. Church, supra,* at pp 488-489; *Church of God v Fourth Church, supra,* at p 744). Indeed, "the making of an executory agreement subject to the approval of the Court, [is] not only not

objectionable or invalid as an act *ultra vires,* but in general, the proper and preferable mode of bringing the whole question of the propriety of giving sanction to the sale into view, and under the discretion which the Court are to exercise." *(Bowen v Trustees of Irish Presbyt. Congregation,* 6 Bosw, at p 267.) For that matter, the statute does not even prohibit an actual conveyance (Religious Corporations Law § 12 [9]). It merely makes any conveyance that is made without court approval subject to defeasance until such time as court approval is obtained, i.e., the conveyance can be confirmed after the sale has been made and the conveyance "executed and delivered" *(see, Church of God v Fourth Church,* 54 NY2d, at p 745 [Cooke, Ch. J., concurring]).

The purpose of requiring court approval is to protect the members of a religious corporation, the real parties in interest, from loss through unwise bargains and perversion of the use of church property *(Church of God v Fourth Church,* 76 AD2d, at p 716). Were plaintiffs a majority of the membership, and not, as they are, a miniscule faction, there might be some merit to hearing their claim that defendants are not promoting the best interests of the church in advance of a section 12 proceeding to be instituted by defendants, the otherwise preferred context for determining whether a disposition should be approved *(Church of God v Fourth Church,* 54 NY2d, at p 744). But the law treats religious corporations as essentially democratic institutions *(Matter of Minister of Ref. Dutch Church,* 16 Barb 237, 243, *supra* ["The remonstrants, though numerous and comprising some of the most respectable men in the church and society, are yet *a minority.* It is the right of a majority to control, in all civil affairs, and not less in the management of the temporalities of a religious society than any other". (Emphasis added.)]; *Wyatt v Benson,* 23 Barb 327, 334-335, *supra* ["It was the judgment and opinion of a majority of the members of the corporation only which carried weight and gave force and effect to the [section 12] proceeding."]; *Cooper v Trustees of First Presbyt. Church,* 32 Barb 222, 233-234 ["When it is desirable to obtain especial sanction for any contemplated proceeding—and it is well to secure such sanction in all matters of importance—the trustees should call a public meeting of the members of the society, and the expression of that meeting, if fairly obtained, would be clear and reliable authority on which the trustees might safely act."]). And, the will of the majority "is presumed to be manifested by the action of the trustees." (32 Barb, at p 233; *see, Bowen v Trustees of Irish Presbyt. Congregation,* 6 Bosw, at p 263; *Wyatt v Benson,* 23 Barb, at p 335.)

Accordingly, the second cause of action seeking a declaration that the expenditure of church funds by defendants on real estate development is ultra vires as beyond their powers under Religious Corporations Law §§ 2 and 5 is without merit. However, plaintiff's first cause of action, challenging the expenditures as violative of article IV, section 5 of the church's bylaws, is viable and warrants declaratory and injunctive relief.

Under the bylaw in question, defendants may not "undertake" the "sale, mortgage, lease or other disposition" of the property in question without the affirmative vote of the majority of the church membership. Emphasizing the word "undertake", plaintiffs argue that the contract to lease with the developer is, in legal effect, a "disposition" of the church's real property. Defendants respond that the contract to lease is so fraught with conditions and reservations as to make actual execution of a lease problematic at best. This exchange over the effect of the contract to lease is not on point. At the root of plaintiffs' claim is not the church's legal relationship to the developer, but the ongoing expenditures being made by defendants in furtherance of real estate development.

In this regard, defendants' basic contention is that they are not required to submit the development plan to the membership for a vote of approval until after the necessary municipal approvals have been obtained; that is not until the end product, the proposal in its final form, is ready for presentation. Pointing to the bylaw itself, they note that it does not, in terms, require membership approval of expenditures and liabilities incurred in connection with real estate development. This, however, begs the question of whether such approval is not implicit in the prohibition against undertaking a disposition. Defendants also point to other provisions of the bylaws authorizing them to make disbursements, meaning regularly occurring and recurring items of expense, and vesting them with "custody and control" of all church property. It is clear, however, or it should be, that the expenditures in dispute are not disbursements; it is also clear that the section of the bylaws giving defendants custody and control over church property is merely declarative of Religious Corporations Law § 5. The question is not whether the defendants have the power of alienation, but whether the bylaw in question has taken that power from them and placed it with the membership.

Aside from the instant action (which is the second attempt by a small number of the membership to enjoin expenditures

on real estate development), this six-year-old dispute has branched off in two directions. The first concerned defendants' authority to submit the 1981 proposal to the membership for a vote without having first convened a special membership meeting for the purpose of taking a vote on whether the bylaws should be amended to include the very provision now before the court. Defendants prevailed *(see, Rector of St. Bartholomew's Church v Committee to Preserve St. Bartholomew's Church,* 84 AD2d 309), but, having voluntarily adopted the bylaws proposed, they rendered the controversy academic and abandoned the benefit of that adjudication. If an agreement on nothing else, the validity of the bylaw in question is taken for granted by all concerned. The second branch concerned the validity of the 1981 membership vote, taken after the bylaw was adopted, which approved defendants' then development plan. This too was decided in defendants' favor *(see, Rector of St. Bartholomew's Church in City of N. Y. v Committee to Preserve St. Bartholomew's Church,* 56 NY2d 71), but, here again, their victory was for naught inasmuch as that vote is acknowledged to be no longer of any significance in view of the changes in the development plan.

What is the force and effect of the bylaw as construed by defendants? How does that construction alter, or provide further definition to, the legal relationship between defendants and the membership? Very little, if at all. For one thing, defendants' construction of the bylaw gives the membership a right of suffrage with respect to the development plan. But this is a right already effectively conferred by Religious Corporations Law § 12. Notwithstanding that there is no specific statutory requirement that a formal vote of the membership be taken in a section 12 proceeding, and, while there may be reasons, difficult though they are to conceive, why a court might withhold its approval of a disposition even though supported by a small majority of the membership, no court is likely to give its approval to a disposition once there is reason to believe that a majority of the membership, no matter how small, is opposed *(see, Wyatt v Benson,* 23 Barb, at p 335). Indeed, as a practical matter, if not purely out of legal or ecclesiastical considerations, defendants have always acknowledged a right of suffrage in the membership with respect to the project, albeit not one to be exercised until an actual conveyance of church property was ready to be made.

True, under defendants' construction of the bylaw, there is something of a cutback in their statutory rights in that, under section 12 they can consummate a conveyance subject to its

being defeated if not eventually approved by the court, whereas, under the bylaw there can be no conveyance under any terms and conditions without a prior affirmative membership vote—in other words, the membership has a direct right of veto as opposed to an indirect right of ratification through the court. This distinction is of little practical consequence, and, to the extent it does give the membership a degree of control over development planning they would not otherwise have, it too goes no further than the limitation defendants have always acknowledged on their power of alienation, even before adoption of the bylaw.

Were the word "undertake" not to be found in the bylaw, the impulse to construe it as effecting a fundamental change in the relationship of the parties might not be so strong. The use of the word is a marked departure from the analog provided by section 12, and manifests an intention to place the power of alienation with the membership. Had the bylaw been intended to be merely declarative of the membership's rights under section 12 as construed by defendants, the bylaw would have tracked the statute and omitted the word "undertake".

This is not to suggest that defendants must return to the membership for approval of every step of what all view to be a long and complex process. It is rather a question of authority and delegation. Authority over real estate development is now with the membership; the initiative must come from them. It is not for defendants to determine that the development of this property is in the best interests of the church, and then to propose a plan of development for the membership's approval. Rather, it is for the membership to determine that development is in the best interests of the church, and to delegate or grant to defendants—or to such of them as they may designate, or to a special committee independent of defendants, or to retain for themselves—such powers, responsibilities and discretionary authority in respect to real estate development as they deem expedient. If defendants do indeed have the authority to spend whatever it takes to decertify the property, it is only because a majority of the membership has voted to give them that authority at, as the bylaw requires, "an annual meeting or a special meeting called by the Vestry for the purpose of taking such a vote". There is no suggestion that the membership ever voted to give defendants such authority. Defendants do suggest, *en passant,* although the point did receive some emphasis on oral argument, that recent annual elections for the vestry have been, in effect, referenda on

defendants' actions with respect to real estate development. This contention is without merit given the clear intent of the bylaw to have the matter of real estate development considered on its own terms by way of a separate resolution.

The delegation of authority can be generous or sparing. Should the membership be so inclined, they can indeed require defendants to return to them for approval of each step of the plan. Or, the membership might prefer to appropriate a sum of money for development to be spent by defendants in their discretion. Or, as defendants would prefer to have it, the membership might give them authority to spend whatever it takes to bring the project up to the point that a conveyance is ready to be made. Power over the purse strings is with the membership, and, while defendants may retain the right to propose, they have lost the right to spend the money necessary to put their proposals in presentable form.

The fifth and sixth causes of action are brought pursuant to Not-For-Profit Corporation Law § 720 (b) (3), and seek an accounting from defendants of the church funds spent on real estate development and payment to the church of the amount thereby wasted. Special Term dismissed these causes of action on the ground that joinder of at least 5% of the membership is required. That determination was correct (*Hoffert v Dank*, 55 AD2d 518).

Plaintiffs' motion for a preliminary injunction enjoining further expenditures by defendants on real estate development should have been granted as relief incidental to a declaration under the first cause of action.

Accordingly, the order of the Supreme Court (Kenneth Shorter, J.), entered on January 9, 1986, which, *inter alia*, denied plaintiffs' motion for a preliminary injunction enjoining defendants from expending any moneys in connection with real estate development, and granted defendants' cross motion for summary judgment on the first and second causes of action, should be modified, on the law and the facts and in the exercise of discretion, to the extent of (1) granting plaintiffs' motion for a preliminary injunction, (2) granting defendants' cross motion for summary judgment on the second cause of action to the extent of declaring that the expenditure of church funds by defendants on real estate development is not ultra vires or beyond their powers under Religious Corporations Law §§ 2 and 5, (3) denying defendants' cross motion to the extent it sought summary judgment on the first cause of action, and (4) on a search of the record, granting plaintiffs

summary judgment on the first cause of action to the extent of declaring that, under article IV, section 5 of the church's bylaws, defendants lack authority to expend church funds on real estate development of the property that fronts on Park Avenue between East 50th and 51st Streets without the affirmative vote of a majority of the qualified voters voting thereon at an annual meeting or a special meeting called by the vestry for the purpose of taking such a vote, and otherwise affirmed, without costs.