OPINION OF THE COURT
Eli Wager, J.
Two related lawsuits have been commenced both raising issues arising out of chapter 46 of the Town of North Hemp-stead Code (Sanitation Code) and its State enabling legislation. The first action, Town of N. Hempstead v Incorporated Vil. of Westbury (index No. 5271/91), was commenced by the Town of North Hempstead (Town) and the Town of North Hempstead Solid Waste Authority to permanently enjoin alleged violations of the Town’s Sanitation Code. The defendants Incorporated Villages of Mineóla and Westbury have counterclaimed alleging, inter alla, tortious interference with contracts, breach of fiduciary duty, conversion, breach of implied contract and seeking an accounting, rescission and a declaratory judgment declaring certain laws unconstitutional.
In the second action, Incorporated Vil. of Great Neck Plaza v Town of N. Hempstead (index No. 12593/91), the Incorporated Village of Great Neck Plaza seeks declaratory and injunctive relief as well as damages relative to the same provisions of the Town’s Sanitation Code.
Plaintiffs and defendants in both actions have moved and cross-moved for summary judgment. Inasmuch as these motions and cross motions raise similar legal questions and arise *227 out of similar facts and are based on the same statutes and local laws, the motions and cross motions in both actions shall be analyzed and determined simultaneously.
I. LEGISLATIVE HISTORY AND BACKGROUND
In 1983, the New York State Legislature enacted Laws of 1983 (ch 299), a law requiring, inter alla, the closure of virtually all Long Island landfills by December 18, 1990 (ECL 27-0704).
Also in 1983, the New York State Legislature enacted Laws of 1983 (ch 544, § 2 [1]) which authorized the Town of North Hempstead to adopt a local law to, inter alla, "exclusively control all solid waste and all energy and materials derived therefrom, including without limitation the collection, transportation and delivery of solid waste to a designated resource recovery facility or facilities within the town of North Hemp-stead for storage or processing or for any other disposition or handling”. Section 2 also provides for the establishment and collection of fees by the Town for said services (L 1983, ch 544, §2 [2]).
The express policy of chapter 544 with respect to the collection and disposal of solid waste in the Town of North Hempstead was "to displace competition with regulation or monopoly public service under the general supervision of the department of environmental conservation” (L 1983, ch 544, § 2). The State expressly granted such authority to the Town so it could "carry out the purposes of chapter five hundred fifty-two of the laws of nineteen hundred eighty, relating to improving the environment by control of air, water and land pollution, and to promote solid waste management planning” (L 1983, ch 544, § 1).
Laws of 1980 (ch 522), which is codified in ECL article 27, provides for the preparation, updating and implementation of the New York State Solid Waste Management Plan (ECL 27-0103). The stated purpose of chapter 522 is to assure coordination of State, regional and local solid waste planning activities and to effect maximum resource recovery from solid waste on a cost-effective basis (ECL 27-0101).
In 1984 the State Legislature amended the Public Authorities Law by adding a new title 13-F (Public Authorities Law § 2409-a et seq.) which created the Town of North Hempstead Solid Waste Management Authority (Authority). The Authority was given express statutory power to, inter alla, acquire, *228 hold, and sell real property for its corporate purposes (§ 2049-d [3]); to "collect, receive * * * transport, process, dispose of, sell * * * recycle and deal with, in any lawful manner and way, solid waste and any products or by-products thereof now or hereafter developed * * * including any energy generated by the operation of any facility” (§ 2049-d [5]); to plan, develop and construct "projects” and to pay for the cost thereof (§ 2049-d [6] ["project” is defined in section 2049-b (8) as "any solid waste management-resource recovery facility”]); to "contract with the town, other municipalities, state agencies, public corporations or persons, for the purpose of collecting, receiving, treating and disposing of solid waste, including, without limitation, to contract with municipalities, state agencies * * * for the delivery of all solid waste generated within a stated area to a specific facility” (§ 2049-d [9]); to borrow money and issue bonds (§ 2049-d [13]); to fix and collect rates, rentals, fees and other charges for use of facilities in order to provide sufficient revenue to pay the principal and interest on the bonds (§ 2049-d [14]).
In addition to the powers vested in the Authority, Public Authorities Law § 2049-u provides that municipalities within the Town shall have the power to adopt local laws limiting competition and requiring that all solid waste generated within its boundaries be delivered to a specified solid waste facility. It further provides, "[t]he town shall be empowered under this section to adopt any such local law requiring the delivery of solid waste to a specified solid waste management facility”. (Public Authorities Law § 2049-u [1].)
The Authority has the power to issue bonds to pay the cost of any project or for any other corporate purpose (§ 2049-h [1]). Neither the Town nor the municipalities are liable on the bonds of the Authority (§ 2049-j).
In 1986, purportedly pursuant to the authority vested in it by Laws of 1983 (ch 544) and Public Authorities Law § 2049-u, the Town of North Hempstead enacted Local Law No. 6, better known as the Town’s Flow Control Law (Town of North Hempstead Sanitation Code § 46 et seq.). Pursuant to the Flow Control Law, all acceptable solid waste and recyclables generated within the Town must be delivered to a solid waste management facility designated by the Commissioner of the Town’s Department of Solid Waste Management (Commissioner) (§ 46-14). "Solid waste management facility” is defined as "any facility employed beyond the initial solid waste collection process including, but not limited to, transfer stations, *229 baling facilities, rail haul or barge haul facilities, processing systems, including resource recovery facilities” (§ 46-2).
In December 1986, the Town entered into written contracts with most of the villages within the Town including defendants Mineóla, Westbury and Great Neck Plaza wherein, in order to induce the Town to maintain a recycling facility, these villages agreed to deliver all recyclables to the Town’s facility in separated form at no charge to the villages. Pursuant to chapter II of the agreement, the villages specifically acknowledged "that all activities with respect to solid waste generated or originated within the Municipality must be conducted in compliance with the Sanitation Code of the Town of North Hempstead, Chapter 46 of the Town Code”.
Finally, on March 15, 1988 the Town and the Authority entered into a landfill concession and solid waste service agreement (the Service Agreement) pursuant to which the Authority assumed responsibility for solid waste management in the Town, which at the time included operation of the Town’s L-5 Landfill (article II). The Town agreed to enforce the Flow Control Law in favor of the Authority and acknowledged that the Authority shall have from the effective date and throughout the term of the Service Agreement the exclusive right to set, collect and receive tipping fees (article II). The term "tipping fees” is defined in article I of the Service Agreement as "that fee set from time to time for disposal of Acceptable Waste at the Landfill or at such other Solid Waste Facility as designated by the Authority.”
Also on March 15, 1988, the Authority purchased a 460-acre tract of land in the Town known as the "Morewood property” for approximately $34,000,000 to be used for solid waste purposes. Specifically, at the time of the purchase, the Authority intended to use 60 acres of the 460-acre tract for recycling and resource recovery facilities, with the balance preserved for future use. The property was financed by a $33,100,000 note secured by a purchase-money mortgage and a pledge of any tipping fees received by the Authority. The property was later refinanced with National Westminster Bank (NatWest) with the Authority again pledging its tipping fees as security.
On December 31, 1988, the effective date of the Service Agreement, the Authority assumed responsibility for handling the Town’s waste and took over operation of the L-5 Landfill. All of the Town’s sanitation workers were transferred to the Authority.
*230 While all the above-described laws were being enacted and agreements being entered into, the Town was apparently considering how it would comply with the Landfill Law’s 1990 closure deadline (ECL 27-0704). According to the director and vice-president of Malcolm Pirnie, Inc., the primary environmental consultant to the Authority since its creation in 1983, the Authority began in 1985 to develop a plan to deal with all the Town’s garbage and to close the Town’s landfill. In 1987, the Authority announced that, after a 2xA-year environmental review, it proposed a plan that included aggressive recycling and the construction of a resource recovery facility to be built at the Morewood site, which it proposed to acquire. As stated above, the Authority did in fact acquire the property, but some time thereafter, the Authority abandoned its plan to construct a resource recovery facility, and announced its intention to supplement its remaining recycling plan with out-of-town incineration. Currently, the Town’s recycling facility is located at the L-5 Landfill. However, according to the Town’s environmental consultants, the Authority intends on developing three separate recycling facilities at the Morewood site. Cost of the recycling facilities is estimated at $20,000,000 and will be financed by an Authority bond issue. Applications to the State Department of Environmental Conservation (DEC) for these facilities were submitted and deemed complete on March 28, 1991.
Meanwhile, as the December 1990 deadline approached, the Town, in fact, had no real alternative to its L-5 Landfill and on December 19, 1990, the Town and the DEC entered an order on consent wherein the Town received an extension from DEC which allowed the Authority to operate the landfill until April 1, 1991 and obligated DEC to consider an application by the Town to extend the landfill’s operation until December 31, 1992. Pursuant to this order on consent, DEC directed the Town to explore the availability of out-of-town resource recovery systems.
This agreement turned out to be short lived because although it called for the Town to remediate the odor problem at the landfill, and although a second consent order was entered on January 15, 1991 which called for additional remedial action to be taken with respect to the odor problems, the State was required to close the landfill on January 19, 1991, after the Town was unable to remediate said odor problem. Parenthetically, the villages have alleged that the *231 Authority personnel are still on the payroll notwithstanding the closure of the landfill has eliminated their usefulness.
While the State was closing the landfill, the Authority applied for and received from DEC emergency authorization to operate a solid waste transfer station. This transfer station, which is located on West Shore Road, has been designated by the Town as the facility to which all solid waste must be delivered and all villages were so notified. The Authority has entered into a short-term contract with a vendor wherein the vendor takes delivery of the town’s garbage at the transfer station and disposes of it at facilities out of State. The Authority pays for this service with the tipping fees collected by the Authority at the transfer station.
Thereafter, in March of 1991, as required by the order on consent, the Town submitted a complete application for a permit to operate the transfer station. DEC deemed the application complete on March 28, 1991. According to DEC’s counsel for solid waste, the Town’s present proposed program of vigorous in-town recycling and out-of-town incineration is consistent with the State’s solid waste hierarchy.
Meanwhile, Westbury and Mineóla, concerned about the approaching deadline, started making inquiry to the Town regarding its planned compliance with the landfill closure law. Receiving, in their view, no satisfactory response and faced with the closure of the L-5 Landfill, these villages began negotiations with American Ref-Fuel Company of Hempstead (Ref-Fuel), operators of a resource recovery facility located in the nearby Town of Hempstead. Thereafter, Westbury and Mineóla entered into agreements with Ref-Fuel and, ignoring the Town’s designation of the transfer station as the site to where all solid waste must be delivered, began delivering a portion of their solid waste directly to Ref-Fuel.
The Town contacted Westbury and Mineóla and Ref-Fuel in an attempt to obtain compliance with its Flow Control Law. However, such attempts were to no avail. Thereafter it moved to preliminarily enjoin defendants’ claimed violations of the law and simultaneously commenced an action in this court for a permanent injunction. In a stipulation made in open court, Ref-Fuel agreed to stop accepting waste from Mineóla and Westbury and the villages agreed to deliver all their waste to the Town’s designated station pending determination of this lawsuit. The Town then discontinued the action as to Ref-Fuel and now moves for summary judgment in its action for a *232 permanent injunction. Westbury and Mineóla have interposed counterclaims and either oppose the motion or cross-move for partial summary judgment. For the reasons set forth below the motion is denied and the cross motion is granted.
Soon after the Town commenced its action against West-bury and Mineóla, the Incorporated Village of Great Neck Plaza commenced an action against the Town seeking declaratory and injunctive relief with respect to the Town’s Flow Control Law. The Town has also moved for summary judgment in this action dismissing the complaint and Great Neck Plaza has cross-moved for summary judgment. For the reasons set forth below, both the Town’s motion and Great Neck Plaza’s cross motion are denied.
n. DISCUSSION
In the Town of North Hempstead action, the Town alleges that Westbury and Mineóla have violated its Flow Control Law. The Town has the general authority to provide for equitable enforcement of its local laws (Municipal Home Rule Law § 10 [4] [b]). Pursuant to this authority, when enacting its Flow Control Law, the Town specifically included a provision authorizing the Town to commence an injunction proceeding to restrain any violations thereof (Town of North Hempstead Sanitation Code § 46-6 [c]).
Where municipalities seek to enjoin violations of their laws or ordinances, a showing of special damages is not necessary. Plaintiff need only demonstrate a violation of law (see generally, Incorporated Vil. of Freeport v Jefferson Indoor Marina, 162 AD2d 434 [2d Dept 1990]; Town of Islip v Clark, 90 AD2d 500 [2d Dept 1982]). However, Westbury and Mineóla have attacked the validity of the Flow Control Law, which necessarily must be addressed before making a determination regarding their alleged violations of said law.
Great Neck Plaza has also challenged the validity of the Flow Control Law or at least, the Town’s present authority to enforce said law. In determining whether the Town may enforce its Flow Control Law, all arguments, both for and against, have been considered.
A. Joinder of Nonparty Villages
In opposition to plaintiff’s motion, Mineóla now claims that other villages must be joined as parties pursuant to CPLR 1001 (a).
*233 CPLR 1001 (a) provides, in pertinent part: "Persons who ought to be parties if complete relief is to be accorded between the persons who are parties to the action or who might be inequitably affected by a judgment in the action shall be made plaintiffs or defendants.”
Three villages directly affected by the outcome of this litigation have been actively participating in these lawsuits. The likelihood that the remaining villages are united in interest is great. Under such circumstances, dismissal or joinder is not necessary (see, Challette v Town of Brookhaven, 43 Misc 2d 264 [Sup Ct, Suffolk County 1964]).
Parenthetically, the court has received correspondence from the Mayor of the Incorporated Village of Manorhaven, as well as correspondence signed by Mayors of 18 additional villages in the Town indicating their full support for the positions and legal arguments of the villages involved in the litigation. They have elected not to seek joinder, however, and appear content to await the outcome of the instant actions. More recently, this court received correspondence from the Nassau County Village Officials Association indicating that by vote of its membership, it wishes to go on record in support of the legal arguments of the villages involved in these lawsuits. The court notes here the receipt of the stated ex parte communications. However, since the other villages are not parties to these actions, their views have not been considered by the court.
Accordingly, Mineola’s request that all other villages be joined is denied.
B. Constitutional Home Rule Considerations
The villages involved in this litigation have raised numerous and complicated issues with respect to the validity of the Town’s Flow Control Law, its State enabling legislation and the Town’s present authority to enforce the law. These issues range from constitutional questions to objections based upon, inter alla, the State Environmental Quality Review Act, the Resource and Conservation Recovery Act, antitrust laws and the Town’s imposition of a surcharge on the tipping fees. As this court finds both Laws of 1983 (ch 544) and the Town’s Flow Control Law to be unconstitutional, the remaining issues have become academic at least for purposes of this motion and shall not be addressed.
1. Laws of 1983 (ch 544)
In considering the constitutionality of chapter 544, the court *234 has been cognizant, of course, that the legislation "carries a presumption of constitutionality and that the [villages] bear the burden of demonstrating beyond a reasonable doubt that it is unconstitutional. This principle requires [the court] to avoid interpreting a statute in a way that would render it unconstitutional if such a construction can be avoided and to uphold the legislation if any uncertainty about its validity exists” (Alliance of Am. Insurers v Chu, 77 NY2d 573 [1991]).
The court further acknowledges that "a duly enacted local law is clothed with the presumption of constitutionality that applies to State legislative enactments * * *. Defeating this presumption places a heavy burden, at the threshold, on the party challenging the local law * * * to prove inconsistency with the State Constitution or general laws of the State” (41 Kew Gardens Rd. Assocs. v Tyburski, 70 NY2d 325, 333 [1987], mot to amend remittitur denied 70 NY2d 951 [1988], citing Lighthouse Shores v Town of Islip, 41 NY2d 7 [1976]).
However, as discussed below, both chapter 544 and the Town’s Flow Control Law violate the home rule provisions of the New York State Constitution and the Municipal Home Rule Law and cannot, under any interpretation, be upheld.
Municipal home rule, constitutionally guaranteed in some form since at least 1894 (NY Const, art XIX, § 2), empowers local governments to enact legislation relating to their property, affairs or government (NY Const, art IX, §2 [c]) while restricting the authority of the State to interfere with respect to the property, affairs or government of local governments (NY Const, art IX, § 2 [b] [2]). "The theory behind home rule is very simple: it is the thought that local problems, in which the State has no concern, can best be handled locally” (Baldwin v City of Buffalo, 6 NY2d 168,172 [1959]).
The New York State Constitution provides that the New York State Legislature "[s]hall have the power to act in relation to the property, affairs or government of any local government only by general law, or by special law only (a) on request of two-thirds of the total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership, or (b) * * * on certificate of necessity” (NY Const, art IX, § 2 [b]).
The request of a local body either by two thirds or upon request of the executive with the majority concurring is a "home rule message”. A certificate of necessity is a message from the Governor. A special law is defined as "[a] law which *235 in terms and in effect applies to one or more, but not all, counties * * * cities, towns or villages” (NY Const, art IX, § 3 [d] [4]).
Although the language of the Constitution is clear, the court is aware that court decisions from as early as 1929 (Alder v Deegan, 251 NY 467 [1929]) and continuing to the present day (e.g., Matter of Town of Islip v Cuomo, 64 NY2d 50 [1984]) have considerably emasculated home rule in New York (see, Cole, Constitutional Home Rule in New York: "The Ghost of Home Rule”, 59 St John’s L Rev 713 [1985]). Specifically, while article IX, § 2 (b) clearly states that the Legislature may not, without a home rule message, enact a special law relating to the property, affairs or government of local government, court decisions have established that where the legislation is a matter of State concern, " 'the State may freely legislate, notwithstanding the fact that the concern of the State may also touch upon local matters’ * * *. Indeed, legislation on matters of State concern 'even though of localized application and having a direct effect on the most basic of local interests does not violate the constitutional home rule provisions’ ” (Matter of Town of Islip v Cuomo, supra, at 5657).
However, " '[t]he mere statement by the Legislature that [the] subject matter of the Statute is of State concern * * * does not in and of itself create a State concern nor does it afford the statute such a presumption’ ” (City of New York v State of New York, 146 Misc 2d 488, 493 [Sup Ct, NY County 1990], affd 158 AD2d 169 [1st Dept 1990], affd 76 NY2d 479 [1990], quoting Town of Monroe v Carey, 96 Misc 2d 238, 241 [Sup Ct, Orange County 1977]).
To the extent that the State must demonstrate a State concern when enacting special laws in areas of relating to a local government’s property, affairs or government, home rule retains at least a breath of life. This court shall not extinguish this fragile breath by simply accepting without further inquiry the legislation’s so-called State interest.
Here, the State has enacted a law regulating solid waste disposal which is limited solely to the Town of North Hemp-stead. As discussed below, solid waste disposal is a matter of local concern and power and the court finds it to meet the definition of "property, affairs or government” of a local government. The only question remaining is whether the State had a valid State concern.
*236 The court notes that chapter 544 contains a pro forma recitation of its purported State concern, i.e., the protection of the environment by controlling air, water and land pollution, and to promote solid waste management. However, the record before the court reveals the true purpose of the law — to provide the Town with a funding mechanism to finance a resource recovery facility. This is simply not a State concern. The court acknowledges that the protection of Long Island’s ground water (which lies in aquifers below Nassau and Suffolk Counties) has been held a State concern (Matter of Town of Islip v Cuomo, supra). However, Town of Islip v Cuomo did not hold that waste disposal is a matter of State concern. Rather, there the court merely held that the landfill law was not unconstitutional despite the fact that it directly affected local concerns (i.e., solid waste) and was enacted without a home rule message because the subject of the legislation (i.e., protection of the ground water resources of all of Long Island) was a matter of State concern. We are not faced here with a matter of such grand scale as the protection of Long Island’s ground water. Rather the legislation in question provides this one Town with a means for solid waste disposal. The court is not convinced that solid waste disposal in this Town of North Hempstead has assumed the proportions of a matter of State concern.
Finally, the court observes that the State’s interference in local concerns has resulted in exactly what home rule was intended to avoid. Home rule recognizes that local governments are in the best position to evaluate their local needs. Chapter 544 passed ostensibly to promote solid waste management has resulted in precisely the opposite. The Town has rejected its proposed resource recovery facility, the landfill has closed, the Town came perilously close to having no viable alternative for disposal of its solid waste, all resulting in out-of-town shipment, and an enormous debt burden. The villages contend that had they been allowed to continue to exercise their home rule powers, there would still be out-of-town shipment but at much lower cost.
Accordingly, for all the reasons stated above, chapter 544 unconstitutionally infringes on the constituent villages’ home rule powers and is invalid.
For the record, the court notes that the New York State Attorney-General was served with the motion papers in the North Hempstead case. In addition, the court contacted the Attorney-General’s office with regard to this motion as re *237 quired where the constitutionality of a statute is being questioned (CPLR 1012 [b]). The Attorney-General has declined to intervene in support of chapter 544’s constitutionality.
The Town’s Flow Control Law, passed pursuant to authority vested in it by chapter 544 and the Public Authorities Law must of necessity also be declared unconstitutional.
2. The Flow Control Law
The NY Constitution provides at article IX, § 2 (d) that "a local government shall not have power to adopt local laws which impair the powers of any other local government” (see also, Municipal Home Rule Law § 10 [5]).
Despite the Town’s protestation that villages have no inherent authority to control their waste disposal, the court finds convincing authority that the opposite, in fact, is true.
The New York State Constitution provides that every local government (which includes incorporated villages) shall have the power to adopt local laws relating to "[t]he government, protection, order, conduct, safety, health and well-being of persons or property therein” (NY Const, art IX, § 2 [c] [10]; see also, Municipal Home Rule Law § 10 [1] [i]). Furthermore, incorporated villages have the express authority to purchase or condemn real property for the establishment of a public waste disposal site (Village Law § 4-412 [3], [4]). Moreover, in reliance on several provisions of the Village Law, it has been held that villages, upon incorporation, have control and jurisdiction over garbage removal within the village, after the expiration of the contract which then controlled garbage removal in the area of the village (Incorporated Vil. of Atl. Beach v Kimmel, 18 NY2d 485 [1966], affg 25 AD2d 531). In affirming the Appellate Division’s holding, the Court of Appeals stated that "it is plain from this congeries of enactments —and notwithstanding them — that the intention of the Legislature was to exclude town special districts from villages (except under special circumstances) insofar as practicable, in order to give greater scope to the exercise of powers by the village authorities” (Incorporated Vil. of Atl. Beach v Kimmel, 18 NY2d, supra, at 491).
In addition, the court notes that towns do not have the general authority to enact legislation affecting the incorporated areas of the town (Municipal Home Rule Law § 11 [3] ["Notwithstanding any provision of this chapter, any local law adopted by a town board shall be effective and operative only in that portion of such town outside of any village or villages *238 therein except in a case where the power of such town board extends to and includes the area of the town within any such village or villages”]; see also, Town Law § 132 [relating to rules, regulations and ordinances]). Thus the intent to limit the scope of town laws to unincorporated areas of the town is clear.
Based on the foregoing, the court finds that solid waste disposal has traditionally been a power held by the villages. Accordingly, the Town is prohibited by article IX, § 2 (d) of the NY Constitution and Municipal Home Rule Law § 10 (5) from adopting local laws impairing this power.
Of course, the ability of the Flow Control Law to withstand constitutional scrutiny was severely weakened by the invalidation of chapter 544. Nonetheless, the court notes for the record that the Flow Control Law attempted to expand the powers given the town in both chapter 544 and Public Authorities Law § 2049-a et seq.
As stated above, chapter 544 authorized the Town of North Hempstead to enact a local law to exclusively control solid waste within the Town. This is stated in several sections of the law: "[s]uch law shall provide for the management on a town-wide basis of all solid waste generated within the town of North Hempstead” (ch 544, § 1); "the town of North Hemp-stead is hereby authorized and directed to adopt a local law (1) to exclusively control all solid waste and all energy” (L 1983, ch 544, § 2).
It should be noted that nowhere in chapter 544 does the State expressly authorize the Town to control the solid waste generated within the incorporated villages. The Public Authorities Law is even more vague. In creating the North Hempstead Solid Waste Authority, the Legislature stated: "To further the governmental and public purposes of the authority, including the implementation of any contract or proposed contract contemplated by this title, the authority and all other municipalities within the town shall have power to adopt and amend local laws imposing appropriate and reasonable limitations on competition including, without limiting the generality of the foregoing, local laws requiring that all solid waste generated or originated within their respective boundaries * * * shall be delivered to a specified solid waste management facility. The town shall be empowered under this section to adopt any such local law requiring the delivery of solid waste to a specified solid waste management facility” (Public Authorities Law § 2049-u).
*239 The court notes that villages as well as the Town are authorized to enact local laws requiring solid waste be delivered to a specified solid waste management facility and does not purport to give the Town exclusive authority to do so. This statute is silent on how the solid waste facility is specified.
In contrast, the Flow Control Law enlarges the Town’s authority to include "[a]ll acceptable waste and recyclables * * * generated or originated within the town, including the municipalities located wholly or in part therein * * * shall be * * * delivered * * * at a Solid Waste Management facility designated by the Commissioner” (Town of North Hempstead Sanitation Code § 46-14; emphasis provided).
Based on the language set forth in both chapter 544 and the Public Authorities Law, the court cannot glean an intent by the Legislature to even include the incorporated villages in the Town’s flow control power. Based on traditional home rule principles, the court finds that chapter 544 and the Public Authorities Law were empowering the Town to control solid waste flow in all areas outside the incorporated villages. Had the State intended to impinge upon the village’s home rule powers, surely a more definite statement of intent so to do would have been expressed.
Finally, in finding that the Town’s Flow Control Law is unconstitutional, the court must necessarily reject the Town’s argument that the villages are obligated by contract to deliver their solid waste to the Town’s designated facility. The contracts in question do not provide that the villages will deliver their solid waste to a facility designated by the Town, but rather simply contains an acknowledgment by the villages that it will comply with chapter 46 of the Town’s Sanitation Code, which is, in fact, the Town’s Flow Control Law. The court need not address the unconvincing contentions by the villages that they were unaware of this provision when signing the contract. Since the court has found the Flow Control Law unconstitutional, that section of the contract agreeing to comply with chapter 46 of the Town of North Hempstead Sanitation Code is unenforceable.
In closing, the court opines that to the extent that the State gave the Town flow control power, it did so with the intention of providing the Town with a funding mechanism to construct a resource recovery facility. Were chapter 544 and the Flow Control Law validly enacted, the court would nonetheless have been reluctant to grant the Town a permanent injunc *240 tian allowing it to continue collecting tipping fees. These fees which should be used to finance a resource recovery facility for the benefit of all the Town residents, have instead been used to finance, at best, a questionable purchase of 460 acres of land which is apparently not being used for any solid waste purpose as well as to pay for the out-of-town shipment of the Town’s solid waste and to maintain the salaries of allegedly unnecessary Authority personnel. The Town has failed to accomplish the stated solid waste disposal purposes of the legislation. Furthermore, it has been alleged that the villages individually could obtain, for themselves, out-of-town shipment at a substantially lower cost than they are now required to pay to the Town.
The court is aware of the financial stress this decision places on the Authority. However, this does not justify ignoring the home rule provision of the State Constitution. Nor should the plight of the Authority alone force the residents of the villages to bear the expense of the Town’s ill-fated policy.
For all the reasons set forth above, the Town’s motions for summary judgment in action Nos. 1 and 2 are denied. Defendant Westbury’s cross motion is granted to the extent that chapter 544 and the Town’s Flow Control Law, Sanitation Code chapter 46 are declared invalid and unconstitutional and the Town’s complaint is dismissed. The counterclaims of West-bury and Mineóla are severed and shall continue. In light of this decision, Great Neck Plaza’s cross motion has been rendered academic and is accordingly denied.