CITY OF NEW YORK et al., Appellants, v STATE OF NEW YORK, Respondent.

First Department, June 28, 1990

## APPEARANCES OF COUNSEL

*Joel Berger* and *Ronald P. Younkins* of counsel *(Peter Lehner* with them on the brief; *Victor A. Kovner, Corporation Counsel,* attorney), for appellants.

*Dennis J. Saffran* of counsel *(Harvey Golubock* with him on the brief; *Robert Abrams, Attorney-General,* attorney), for respondent.

*Robert T. Perry* of counsel *(Richard M. Weinberg,* attorney), for members of Council of City of New York, *amici curiae.*

*Raymond A. Fasano* for Assemblyman Robert A. Straniere, *amicus curiae.*

## OPINION OF THE COURT

WALLACH, J.

The action seeks a declaration as to the constitutionality of Laws of 1989 (ch 773), as amended by Laws of 1990 (ch 17) (herein chapter 773), a special law setting forth a process by which the Borough of Staten Island may be separated from the City of New York and established as a new City of Staten Island. Chapter 773 first provides for a referendum in which only Staten Islanders would vote on whether a commission of only Staten Islanders should be created to draft a proposed charter for a proposed City of Staten Island independent of the City of New York. In the event of a majority affirmative vote, there would then be a period set aside for public hearings on the proposed charter on Staten Island only, to be followed by a second referendum in which only Staten Islanders would vote on whether the proposed charter should be adopted. In the event of a majority affirmative in this second referendum, the charter commission is to prepare "proposed legislation enabling the borough of Staten Island to disengage and separate from the city of New York." The final step would be enactment of such enabling legislation.

The concurring opinion would declare chapter 773 to be constitutional on the ground that "the Legislature may, after all, choose to present any final enactment for the approval of the entire body politic of the City of New York." This is to strongly suggest, if not actually to hold, that the Legislature must somewhere along the line, before a secession is actually effected, amend chapter 773 so as to "authorize a method whereby the residents of [the other four boroughs] are accorded the opportunity to express their views on the subject." We hardly think it appropriate for a court to advise the Legislature as to what it must do with a piece of legislation so as to avoid a future declaration of unconstitutionality; in any event, we see no basis for anticipating, as the concurrers apparently do, a future inclination on the part of the Legislature to obtain input from the residents of the other four boroughs, let alone their consent.

■ It is clear that chapter 773 was designed primarily to inform the Legislature as to the extent of secessionist sentiment on Staten Island and the manner in which Staten Islanders would govern themselves if permitted to do so; not the least concern is shown for public sentiment in the other four boroughs. There is no reason to suppose that the legisla-

tors who enacted chapter 773 intend to await a home rule message from the City of New York before passing upon the enabling legislation should the process go that far, or are contemplating further legislation putting the question of Staten Island's secession to the residents of the other four boroughs. Certainly, there is no room for any such supposition in the State's argument. The State's position is that chapter 773 would be constitutional without a home rule message even if affirmative votes by Staten Islanders in the referenda being put to them were determinative and not merely advisory. Indeed, the State goes further, asserting, if not advocating, the right to create a new City of Staten Island without a home rule message and without putting the question to any segment of the electorate. Simply put, the State claims a power to create and alter municipal boundaries that is plenary, or absolute, except as it might be limited by general laws. We should take this claim at face value, accept that the State really does mean to "bypass" input from the other four boroughs and to implement this process without further refinement or amendment, and decide whether the State can, as it claims, carve a new city out of the territory of one already existing without a home rule message from the already existing city. To say that this issue is not ripe for determination is like saying that events were not ripe for determination in the harbor of Charleston, South Carolina, in April 1861.

Moreover, it is not so that chapter 773 is purely advisory in nature. It is only in the event of affirmative votes in both of the referenda being put to Staten Islanders that further legislation will be required to effect a secession. A negative vote in either referendum will, according to the State, stop the process cold. Staten Islanders are thereby given a veto power over secession denied the residents of the other four boroughs. Surely this raises a question of equal protection ripe for adjudication—why should Staten Islanders be given the franchise to stop secession and other New Yorkers not?

With respect to the merits, plaintiffs argue that chapter 773, contemplating as it does dismemberment of the City of New York on such a large scale, relates to the property, affairs or government of the City of New York, and that a home rule message from either the Mayor or City Council of the City of New York is therefore required under NY Constitution, article IX, § 2 (b) (2). As authority, plaintiffs rely principally on *City of New York v Village of Lawrence* (250 NY 429, 445), which, while holding a home rule message to

have been unnecessary for purposes of a State law that had detached a narrow strip of undeveloped land from the City of New York and annexed it to Nassau County, nevertheless "recognize[d] that, conceivably, in some cases the effect of a change of the boundaries of a city upon its property, affairs or government might be very serious" and so substantial as to implicate home rule. However, to the extent *Lawrence* left open the question of whether a "serious" change in a city's boundaries can be made by the State without a home rule message, we think it was answered the very same year in *Adler v Deegan* (251 NY 467), a "decisively enlightening case" *(Wambat Realty Corp. v State of New York,* 41 NY2d 490, 494), where, albeit in dictum, the court's plurality opinion explained that *Lawrence* did not rest on "[t]he degree of the [boundary] change, or its importance", but on the "principle" that laws affecting municipal boundaries simply do not "com[e] within the Home Rule provisions" of the Constitution *(supra,* 251 NY, at 474, citing *People ex rel. Unger v Kennedy,* 207 NY 533). This is because under NY Constitution, article IX, § 2 (a) and article X, § 1, the Legislature is expressly empowered to create and organize local governments and to create municipal corporations by special law. As to these matters, the power of the Legislature is "plenary" and beyond home rule constraints *(City of New York v Village of Lawrence, supra,* at 440; *see also, Matter of LaGuardia v Smith,* 228 NY 1, 7; *Adriaansen v Board of Educ.,* 222 App Div 320, 323-324, *affd* 248 NY 542). Given this constitutionally conferred, plenary power over municipal boundaries, the subject is a matter of State concern by definition *(see, Matter of Board of Educ. v City of New York,* 41 NY2d 535, 542), and the State is free to legislate unfettered by home rule constraints. Legislation dealing with matters of State concern, albeit of localized application and having a direct effect on the most basic of local interests, does not violate the Constitution's home rule provisions *(Adler v Deegan, supra,* at 490-491; *Matter of Board of Educ. v City of New York, supra,* at 542-543; *Wambat Realty Corp. v State of New York, supra,* at 493-494; *Matter of Town of Islip v Cuomo,* 64 NY2d 50). Nothing in the concurring opinions in *Adler* takes issue with the plurality's explanation of *Lawrence.*

Plaintiffs' equal protection claim invokes a very closely divided California Supreme Court in *Fullerton Joint Union High School Dist. v State Bd. of Educ.* (32 Cal 3d 779, 654 P2d 168), but, unlike some of the views expressed in that case, we do not read the decisions of the United States Supreme Court

as mandating that in referenda affecting territorial boundaries, the residents of the bulk of the affected political subdivision must be given, through the franchise, an equal opportunity to veto a proposed boundary change *(see, Hunter v City of Pittsburgh,* 207 US 161). In a "single-shot" referendum, the issue to be submitted to the electorate must be analyzed in terms of whether its adoption or rejection will have a disproportionate impact, or be of special interest, to an identifiable group of voters. If such is the case, and the classification between those who are specially interested and those who are not is reasonably precise, the latter class may be validly excluded from the franchise *(Lockport v Citizens for Community Action,* 430 US 259, 266, 271-272; *Salyer Land Co. v Tulare Water Dist.,* 410 US 719, 728; *Kramer v Union School Dist.,* 395 US 621, 632). Moreover, classifications based on geographical location of residency, as opposed to property ownership, for example, are, along with age and citizenship, among the most acceptable bases of differentiation *(Hill v Stone,* 421 US 289, 297). Indeed, even where a political subdivision of a State exercises extraterritorial police and regulatory powers, enfranchisement of residents of the area outside of the political subdivision is not constitutionally mandated even in *general* elections *(Holt Civic Club v Tuscaloosa,* 439 US 60). Given the extraordinarily wide latitude that States are given in the creation of various types of political subdivisions, the State can legitimately adopt a geographic classification based upon the boundaries of a proposed new political subdivision to be created if approved by the electorate of the smaller, but significant, separating community *(see, Moorman v Wood,* 504 F Supp 467; *St. Louis County, Mo. v City of Town & Country,* 590 F Supp 731; *see also, People ex rel. Unger v Kennedy, supra).* Plaintiffs argue that a structure of the present political subdivision creates a community of interest entitling the residents of the other four boroughs to vote on the submitted issue, but, while the residents of the other four boroughs, constituting 94.8% of the city's population, would bear an impact from the proposed separation, the impact upon Staten Island residents would be of a significantly more substantial and direct character. Only they will be subject to the general governmental powers of a City of Staten Island. This, and the State's apparent interest in facilitating that community's (and county's) self-determination, amply justify a classification that prevents the residents of the other four communities from exercising a veto power over the question of secession.

In sum, the framework of the State constitutional provisions vesting full power in the Legislature with respect to the creation and revision of local governmental entities can be said to contemplate that the interests of the less directly affected voters are adequately represented by their elected representatives in that very legislative body *(see, Holt Civic Club v Tuscaloosa, supra,* at 77 [Stevens, J., concurring]; *Ball v James,* 451 US 355, 371, n 20, 373 [Powell, J., concurring]).

Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.), entered on or about May 22, 1990, which denied plaintiffs' motion for summary judgment declaring Laws of 1989 (ch 773), as amended by Laws of 1990 (ch 17), to be unconstitutional, and granted defendant's cross motion for summary judgment declaring said law to be constitutional, should be affirmed, without costs.

MILONAS, J. (concurring). I concur with the majority only insofar as I agree that Laws of 1989 (ch 773) (herein chapter 773), as written, does not violate either the Federal or State Constitutions. It is unnecessary and, indeed, repugnant to the proper role of the courts to render an advisory opinion where one is not required, particularly when this entails placing the judiciary's prior stamp of approval on a matter so unsettled and speculative as that involved here. Certainly, it is inappropriate for us to ignore the precedent that has so long guided our courts merely because the parties request a prospective judicial determination. In the final analysis chapter 773, as promulgated, need not be construed in such a manner as would mandate that it be declared unconstitutional; and it is axiomatic that, whenever possible, a statute should be given an interpretation which avoids constitutional infirmity *(People v Epton,* 19 NY2d 496, *remittitur amended* 19 NY2d 1017, *cert denied* 390 US 29; *Rector, Church Wardens & Vestrymen of St. Bartholomew's Church v Committee to Preserve St. Bartholomew's Church,* 84 AD2d 309, *appeal dismissed* 56 NY2d 645; *New York Pub. Interest Research Group v Insurance Information Inst.,* — AD2d — [1st Dept, May 3, 1990]).

By its terms, chapter 773 provides for a referendum in November of 1990 in which only Staten Island residents would vote upon whether they wish to initiate the secession process, to be followed, in the event of an affirmative result, by the creation of a commission dominated by Staten Islanders. This commission would then recommend a charter for a prospective City of Staten Island. Public hearings on Staten Island would

ensue in connection with the Commission's proposals. Thereafter, another referendum, again limited to Staten Island voters, would be conducted, and another affirmative outcome would cause the submission by the same Staten Island-controlled commission of suggested legislation for consideration by the State Legislature. Yet, irrespective of whether the vote of the Staten Islanders is positive or negative, it is nonbinding and advisory. Chapter 773 neither commits the Legislature to take any particular action nor precludes it from, for instance, subsequently soliciting a home rule message from the City of New York and/or arranging for a city-wide referendum. Contrary to the majority's view, a negative vote need not "stop the process cold" but would, rather, return the matter to the status quo, leaving the Legislature with the same power it always had; that is, able to resume the process in any manner it deems warranted.

In fact, it is the majority which is engaging in speculation and mind reading as to the intent of the Legislature. Surely, there is no reason to expect the Legislature to act in an unconstitutional manner, and, regardless of the outcome of the vote, the Legislature may decide to do nothing. Accordingly, the challenged law is, in effect, advisory only and does not inexorably lead to the separation of Staten Island from the City of New York. While chapter 773 clearly commences a procedure which may eventually terminate in secession, it does not compel such a consummation. Since the statute, on its face, is not self-implementing and contemplates further legislative initiative, we may not anticipate that the Legislature will not, assuming that the voters of Staten Island have indicated a desire to disengage from the city, authorize a method whereby the residents of Brooklyn, Bronx, Manhattan and Queens, as well as its public officials and citizens groups, are accorded the opportunity to express their views on the subject. Therefore, it is premature for this court to decide whether the State Legislature may constitutionally bypass obtaining the consent of the city and the voters of all of the boroughs prior to effecting the separation of Staten Island; the Legislature may, after all, choose to present any final enactment for the approval of the entire body politic of the City of New York. If and when the Legislature fails to do so will be the proper time for the courts to examine the constitutional implications of its actions.

SULLIVAN, J. P., and CARRO, J., concur with WALLACH, J.; MILONAS and ASCH, JJ., concur in an opinion by MILONAS, J.

Order, Supreme Court, New York County, entered on or about May 22, 1990, unanimously affirmed, without costs and without disbursements.