**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 7, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CITY OF HERRIMAN, a
municipality; JAMES LYNN CRANE,
an individual, on behalf of himself and
others similarly situated; RYAN
CARTER, an individual, on behalf of
himself and others similarly situated;
MARIANNE CARTER, an individual,
on behalf of herself and others
similarly situated; BRETT WOOD, an
individual, on behalf of himself and
others similarly situated; TAMARA
WOOD, an individual, on behalf of
herself and others similarly situated;
CHRISTOPHER BREMS, an
individual, on behalf of himself and
others similarly situated; DANIELLE
BREMS, an individual, on behalf of
herself and others similarly situated;
JACK D. DUFFY, Guardian of C.D., a
minor and disabled person on behalf of
himself and others similarly situated,

      Plaintiff-Appellants/
      Cross-Appellees,

    v.

GREG BELL, as Lieutenant Governor
of the State of Utah,[*]

      Defendant-Appellee/
      Cross-Appellant,

Nos. 08-4056 and 08-4075

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Greg Bell is substituted for Gary R. Herbert.

and

SHERRIE SWENSEN, as Salt Lake
County Clerk,

Defendant-Appellee.

and

CITY OF COTTONWOOD HEIGHTS,
SANDY CITY, DRAPER CITY, and
CITY OF MIDVALE,

Intervenors-Defendants/
Appellees.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:07-CV-00711-TS)**

Blake T. Ostler, Mackey Price Thompson & Ostler, Salt Lake City, Utah (with
Jeffrey R. Olsen, Mackey Price Thompson & Ostler, Salt Lake City, Utah on the
Reply Brief, and Catherine L. Brabson and John N. Brems, Parsons Kinghorn
Harris, Salt Lake City, Utah on the Opening Brief), for Appellants/Cross-
Appellees.

Jeffrey L. Shields, Callister Nebeker & McCullough, Salt Lake City, Utah, for
Intervenors-Defendants/Appellees, and Brent A. Burnett, Assistant Utah Attorney
General, Salt Lake City, Utah, for Defendant-Appellee and Cross-Appellant Greg
Bell (with Thom D. Roberts, Assistant Utah Attorney General; and Mark L.
Shurtleff, Utah Attorney General, Salt Lake City, Utah for Defendant-
Appellee/Cross-Appellant Bell, T.J. Tsakalos and David H.T. Wayment, Deputy
District Attorneys, Salt Lake City, Utah, for Defendant-Appellee Swensen, and
Zachary T. Shields and Michael D. Stanger, Callister Nebeker & McCullough,
Salt Lake City, Utah, for Intervenors-Defendants/Appellees) for Defendants-
Appellees, Cross-Appellants, and Intervenors-Defendants/Appellees.

Before **TACHA**, **MURPHY**, and **TYMKOVICH**, Circuit Judges.

-2-

**TYMKOVICH**, Circuit Judge.

This case presents an equal protection challenge to a Utah statute that allows cities, through an election open only to residents in the proposed new district, to detach from an existing school district.

The Appellants in this case were excluded from voting in an election that reduced the size of their existing school district because they were outside the proposed new district's boundaries. They argue Utah's detachment law violates their Fourteenth Amendment equal protection rights since they have a substantial interest in the new school district's configuration and boundaries. In a summary judgment ruling dismissing the equal protection claim, the district court concluded the school district detachment statute advances legitimate state policies and therefore withstands rational basis review.

After considering Utah's statute and the applicable equal protection principles, we agree with the district court that rational basis review applies and the Utah statute bears a rational relationship to legitimate state purposes. The electoral scheme furthers, among other things, the state's interests in promoting local control of public school districts by extending the franchise only to those voters who will reside in the new district.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## I. Background

Utah law provides three ways to initiate the process of creating a new school district: (1) through a citizen initiative petition; (2) at the request of the board of the existing or future districts; or (3) at the request of a city or group of cities within the boundaries of an existing school district. *See* Utah Code Ann. § 53A-2-118(2)(a).

Initiating the creation of a new school district under either of the first two methods—citizen initiative or school board action—puts the issue before all legal voters in the existing school district. *See id.* § 53A-2-118(4)(d)(i). But initiating the creation of a new school district under the third method puts the issue before only residents within the proposed new school district's boundaries. *See id.* § 53A-2-118(5)(a)(i).

In 2007, several cities[1] (Intervenors) within the Jordan School District entered into an interlocal agreement to detach from the district. At the time, the Jordan School District was one of the forty largest in the country and served a substantial portion of Salt Lake County. The proposed new district, which would contain approximately forty-three percent of the then-existing Jordan School District's student population, would encompass the cities predominately in the eastern part of the Jordan School District as well as a small portion of a

---

[1] The cities (also parties in this lawsuit) are Cottonwood Heights, Sandy City, Draper City, and Midvale City. The City of Alta, which also entered into the interlocal agreement, is not a litigant.

neighboring school district. The Intervenors initiated the detachment process using the third method Utah law provides. *See id.* § 53A-2-118(2)(a)(iii). Thus, only residents in the proposed new district would vote in the election.[2]

Shortly before the scheduled election, a number of voters residing within the Jordan School District, but outside of the proposed new district, sought injunctive relief in federal court against the Lieutenant Governor of Utah, at that time Gary R. Herbert, and the Salt Lake County Clerk, Sherrie Swensen. They claimed this exclusion from voting violated equal protection principles.[3] Herriman City, also located in the Jordan School District, but outside the proposed new district, joined the suit as well.

The district court denied the injunction request after concluding Herriman City and the excluded voters failed to show a reasonable likelihood of succeeding on the merits with their claim that the Utah statutory scheme violated equal protection. *See Herriman City v. Swensen*, 521 F. Supp. 2d 1233 (D. Utah 2007).

---

[2] This third statutory method of detachment did not exist when the cities originally sought to form a new school district. The Utah State Legislature only added it after the cities initially failed to put the detachment issue on the ballot using the second method. *See Herriman City v. Swensen*, 521 F. Supp. 2d 1233, 1235–36 (D. Utah 2007).

[3] Herbert, an appellee and cross-appellant in this case, is charged with filing the certificate to create a new school district. *See* Utah Code Ann. § 53A-2-118(5)(b)(i)(B). Swensen, also an appellee in this case, is charged with placing a proposal to detach a portion of a school district on the general election ballot, and placing school board candidates in the subsequently divided school districts on the ballot. *See id.* §§ 53A-2-118(5)(a), -118.1(3)(a)(i).

The election occurred as scheduled in November 2007, and residents of the proposed new school district voted to create the district. The cities in the new district and the remaining Jordan School District then began the process of detaching and creating the new school district as Utah law prescribes.

The parties filed cross-motions for summary judgment in January 2008. After briefing and oral argument, the district court, among other things, granted summary judgment in favor of the defendants on both the facial and as-applied equal protection challenges to the detachment statute. *See Herriman City v. Swensen*, No. 2:07-CV-711 TS, 2008 WL 723725 (D. Utah Mar. 14, 2008).

On appeal, the excluded voters make two equal protection arguments: (1) the district court erred in applying rational basis review to the detachment statute instead of strict scrutiny, and (2) even if rational basis review was appropriate, the detachment statute would nevertheless fail to pass constitutional muster.[4]

The crux of the voters' equal protection argument is that while a state may limit local voting rights to residents in a particular electoral district, strict scrutiny review applies when the state defines that particular district so as to exclude voters who are "substantially interested in and affected by" the election at issue. Aplt. Br. at 15, 31. Utah's detachment statute, they assert, excludes voters in precisely this way.

---

[4] This case also presents standing and justiciability issues that do not bear on the core equal protection claim. We address these arguments separately below.

To demonstrate they were substantially interested in and affected by the election from which they were excluded, the voters marshal evidence detailing the detachment's impact—most notably the financial consequences they will experience because of the split. These include both short- and long-term property tax increases, an abiding property tax disparity with the detaching school district, debt servicing obligations, and approximately $40.5 million in division costs (as opposed to $25.8 million for the new district). On top of these financial costs lie significant logistical and administrative burdens, including appointing a transition team, allocating property between the districts, and transferring educators and personnel. *See* Utah Code Ann. § 53A-2-118.1(3)–(4). Finally, the detachment affects the Jordan School District's self-governance in the short term—the district must hold elections for its new school board as a result of the separation, *see id.* § 53A-2-118.1(3)—as well as in the long term.

Citing these facts and relying on the Supreme Court's equal protection case law, the voters claim their inability to vote under the detachment statute results from an impermissible voting restriction. Strict scrutiny review should therefore apply to strike down the statutory scheme, they argue, and the district court erred in failing to apply the heightened standard.

For the reasons discussed below, we disagree.

## II.  Analysis

We review the district court's grant of summary judgment de novo, "applying the same legal standard used by the district court."  *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008).  Summary judgment is appropriate if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  We examine the factual record and draw all reasonable inferences in the light most favorable to the non-moving party.  *See Somoza*, 513 F.3d at 1210.

### A.  <u>Standing and Justiciability Issues</u>

Before reaching the merits of the excluded voters' equal protection claims, we must first address several preliminary jurisdictional matters, including mootness and standing.

#### 1.  *Mootness*

Our Article III case-or-controversy requirement continues through all stages of federal judicial proceedings.  "[I]t is not enough that a dispute was very much alive when suit was filed."  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).  Pointing to this rule, the detaching cities argue the equal protection issue here is now moot and this case is no longer justiciable.

"In general a case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (internal citation and punctuation omitted).  The

alleged constitutional violation before us is the denial of the right to vote. The school district held its election in November 2007, at which time the plaintiffs' cause of action accrued. Furthermore, since the election, the process of organizing the new school district has proceeded as outlined in the detachment statute. School board elections have been held, substantial money and time have been spent, and the detachment process has gone forward as planned. The cities also note that in 2009 the new district began to provide educational services to its students. The issue in the case, they argue, is thus moot.

As the district court correctly concluded, however, this case fits comfortably within the established exception to mootness for disputes "capable of repetition, yet evading review." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007); *see also Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) (finding that while a challenged election was over, the case was not moot because the controversy was capable of repetition, yet evading review). This exception to mootness applies where "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). Both circumstances are present here.

Regarding the first prong of the exception, neither party disputes that the challenged action—the November 2007 election—was too short in duration to be

fully litigated before its conclusion. The excluded voters were unable to file their complaint challenging the November election until late September 2007. As the district court noted, "full litigation on the merits was simply not possible before the election." *Swensen*, 2008 WL 723725, at *3.

The second prong of the "capable of repetition" exception requires a "reasonable expectation" or a "demonstrated probability" that "the same controversy will recur involving the same complaining party." *Wis. Right to Life*, 551 U.S. at 463 (quotations omitted). The same controversy is sufficiently likely to recur when a party has a reasonable expectation that it will be subjected to the alleged illegality again. *See Morse v. Republican Party Va.*, 517 U.S. 186, 235 n.48 (1996); *Storer v. Brown*, 415 U.S. 724, 727–28 & n.8 (1973). Here, there is a reasonable expectation that the excluded voters will be subjected to the same alleged illegality. That is so because, as the district court observed, other areas within the remaining portion of the Jordan School District were considering whether to create their own school districts. *See Swensen*, 2008 WL 723725, at *3. If a city decides to create a new district within the remaining Jordan School District, the voters would again be excluded from participating in the election on that issue. In these circumstances, we conclude a reasonable expectation exists that the same controversy involving the same complainant will recur.

Because this dispute is capable of repetition but evades review, mootness does not preclude us from deciding this case.

## 2. *Standing and Permissive Intervention*

This case also presents standing and permissive intervention issues.

### i. **Swensen**

Swensen is the Salt Lake County Clerk charged with placing a proposal to detach a portion of a school district on the general election ballot, and placing school board candidates in the subsequently divided school districts on the ballot. *See* Utah Code Ann. §§ 53A-2-118(5)(a), -118.1(3)(a)(i). Swensen argues (1) the excluded voters lack standing to assert their claims because they cannot obtain a remedy from her that will redress their injuries, and (2) the excluded voters' claims against her are now moot because she has already placed the detachment and school board candidacy issues on the ballot. We reject both arguments.

The irreducible constitutional minimum of standing contains three elements: injury in fact, a causal connection between the injury and the conduct complained of, and a likelihood that a favorable decision will redress the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Swensen argues that, even assuming they can demonstrate the first two elements, the excluded voters still lack standing because they cannot show redressability. According to Swensen, because she has merely ministerial duties under the detachment statute, she cannot cure any constitutional infirmities. Whatever order federal courts may craft in this case, she has no power to enforce it upon the state, its officials, or any local government entity seeking detachment from an

-11-

existing school district. The appropriate challenge, she argues, should be directed at the state. *See* Utah Code Ann. § 67-5-1(2) (mandating the Utah Attorney General defend in all cases where state officers are parties and take charge in civil matters of interest to the state).

Swensen, however, cannot dispute that the district court has the power to enjoin her from conducting school district-related elections under her authority stemming from the challenged statute. Nor can she argue that, at the time the lawsuit was filed, she was not the appropriate local official for injunctive relief. So while she may not be able to enforce a federal remedy against the state, she was the official responsible for running the local detachment election, and may yet be subject to future federal court restrictions. This is sufficient to satisfy the voters' redressability requirement for standing. *See Lujan*, 504 U.S. at 561.

Because Swensen's role under the detachment statutory scheme is ongoing, her mootness argument is unavailing. Further, as we concluded above, the issue this scheme presents is capable of repetition.

We therefore reject Swensen's challenges to the voters' standing as well as her argument that the issue is moot.

### ii. Herriman City

In a cross-appeal, Herbert argues Herriman City is a political subdivision of the state and lacks both standing and the authority to bring a Fourteenth Amendment equal protection claim against Utah or its officers. The district court

agreed, but nevertheless allowed Herriman City to intervene under Rule 24(b) of the Federal Rules of Civil Procedure. *See Swensen*, 2008 WL 723725, at *5. We find the district court correctly determined Herriman City lacked authority to bring an equal protection challenge, but we also conclude the district court erred in permitting Herriman City to intervene.

First, the district court correctly held Herriman City may not challenge the constitutionality of a state statute under the Fourteenth Amendment. *See Rural Water Dist. No. 1 v. City of Wilson*, 243 F.3d 1263, 1274 (10th Cir. 2001) (noting that because they are creatures of the state, political subdivisions "possess no rights independent of those expressly provided to them by the state") (quotation omitted); *see also Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998); *Hous. Auth. of Kaw Tribe v. City of Ponca City*, 952 F.2d 1183, 1188 (10th Cir. 1991). Likewise, a political subdivision may not challenge the validity of a fellow political subdivision's actions under the Fourteenth Amendment, unless such a suit is expressly authorized. *See Kaw Tribe*, 952 F.3d at 1190. Because suits against state officials in their official capacities are no different than suits against the state itself, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), that logic applies equally to Herbert and Swensen. Herriman City thus lacks both independent standing and the authority to bring this Fourteenth Amendment equal protection claim.

-13-

Second, although the district court held Herriman City had neither rights to protect under the Fourteenth Amendment nor the authority to bring suit, it nevertheless permitted the city to intervene under Rule 24(b).  We review such a determination for an abuse of discretion.  *See Alameda Water & Sanitation Dist. v. Browner*, 9 F.3d 88, 90 (10th Cir. 1993).

Herbert argues the district court abused its discretion because, as a matter of law, Herriman City does not satisfy Rule 24(b)'s requirements.  *See DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 943 (10th Cir. 2005) (stating a district court abuses its discretion when it bases its decision on an erroneous conclusion of law).  In particular, he asserts, Herriman City lacks "*a claim*" that "shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B) (emphasis added).  Herbert contends Herriman City cannot possibly have *a claim* in common with the other plaintiffs because, as explained above, Herriman City does not have rights protected under the Fourteenth Amendment.  Because Herriman City would not be able to bring a claim as a plaintiff, he concludes, the district court abused its discretion in permitting the city to intervene.

We agree that Herriman City should not have been permitted to intervene. It is true our case law supports the view that a prospective intervenor need not have its own standing to intervene under Rule 24(b).  *See, e.g.*, *City of Colo. Springs v. Climax Molybdenum Co.*, 587 F.3d 1071, 1079 (10th Cir. 2009)

("[P]arties seeking to intervene under Rule 24(a) or (b) need not establish independent Article III standing *so long as another party with constitutional standing on the same side as the intervenor remains in the case*. [S]uch piggyback standing is permissible.") (internal citations and punctuation omitted). It is also true the words "claim or defense," as they appear in Rule 24(b), should not be strictly interpreted so as to preclude permissive intervention. *See Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967) ("[I]ntervention has been allowed in situations where the existence of any nominate 'claim' or 'defense' is difficult to find.") (internal quotation marks omitted).

Nevertheless, to intervene under Rule 24(b) the proposed intervenor must have a claim or defense that shares at least some aspect with a claim or defense presented in the main action. Here, because the Fourteenth Amendment claim Herriman City asserts is foreclosed, Herriman City has no claim and thus cannot satisfy Rule 24(b)'s requirements. This being the case, however, nothing would prevent the district court from allowing Herriman City to participate as an amicus curiae and present its views in that manner.

Accordingly, while we recognize that the district court's discretion under Rule 24(b) is very broad, *see United States v. Hooker Chem. & Plastics Corp.*, 749 F.2d 968, 990 n.19 (2d Cir. 1984), we find that the district court should not have allowed Herriman City to participate as an intervenor against the state.

## B. Equal Protection and Applicable Review

We now turn to the excluded voters' equal protection challenge to the Utah school district detachment statute.

The right to vote is fundamental under the Constitution. *See Reynolds v. Sims*, 377 U.S. 533 (1964). The voters here argue the statute's detachment method burdens their voting rights and excludes them from having a voice in the composition of a basic unit of government: the local school district. Compelling reasons, they argue, do not justify those burdens given the voters' substantial interest in the composition and boundaries of the Jordan School District.

While we agree the Utah statute implicates the right to vote, our review of established Supreme Court precedent persuades us that the Utah detachment statute must be judged—as the district court concluded—by whether its limitation rationally furthers legitimate state policies. Applying the rational basis standard, we conclude the detachment statute furthers reasonable government interests and comports with the requirements of equal protection.

### 1. *Supreme Court Framework*

We start with a line of cases beginning over one hundred years ago. In these cases, we see that the Supreme Court has consistently favored the political judgments of state legislatures in structuring political subdivisions within states and defining the electoral community making up those entities. More importantly, the Court has consistently upheld laws that give different

-16-

constituencies different voices in elections, especially those involving the annexation or adjustment of political boundaries.

The Supreme Court first considered challenges to state laws defining qualified voters in local annexation elections in *Hunter v. City of Pittsburgh*, 207 U.S. 161 (1907). The election at issue in *Hunter* would have combined the City of Pittsburgh with a smaller neighboring community. State law required that the combined population of both jurisdictions determine the annexation question. The voters of the smaller city—who overwhelmingly opposed annexation— objected to the statute, arguing that it effectively diluted their votes because of their relatively small population when compared to Pittsburgh. *See id.* at 177. The Supreme Court unanimously rejected the challenge, holding that states are vested with largely unrestricted power to determine the boundaries and manner of formation of their political subdivisions and how they vote. *See id.* at 178–79.

The *Hunter* Court affirmed that the "state is supreme" in constructing municipalities' boundaries. It may

> expand or contract the territorial area [of a city], unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. *All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body . . . may do as it will, unrestrained by any provision of the Constitution of the United States . . . .* The power is in the state, and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it.

-17-

*Id.* (emphasis added).  Subject to certain important limitations discussed below,

*Hunter* remains good law.  *See, e.g.*, *Hess v. Port Auth. Trans-Hudson Corp.*, 513

U.S. 30, 47 (1994) (citing *Hunter* and affirming that "ultimate control of every

state-created entity resides with the State . . . [and p]olitical subdivisions exist

solely at the whim and behest of their State" (internal quotation marks omitted)).

Since *Hunter*, however, the Supreme Court has placed two key limitations

on the expansive articulation of state power over political subdivisions.  First,

neither states nor their political subdivisions may draw boundaries that

discriminate on an invidious basis, such as race or sex.  *See, e.g.*, *Gomillion v.*

*Lightfoot*, 364 U.S. 339, 341 (1960) (rejecting an Alabama boundary statute that

removed "all save four or five of [a city's] 400" black voters).

Second, equal protection prohibits states from restricting or diluting votes

in violation of the "one person, one vote" principle announced in *Reynolds v.*

*Sims*, 377 U.S. 533 (1964), and extended to local governments in *Avery v.*

*Midland County*, 390 U.S. 474 (1968).

In a series of cases following *Reynolds* and *Avery*, the Court addressed and

reconciled the competing demands of local control of political subdivisions on the

one hand, and voter equality on the other.[5]  But the core holding of *Hunter* has

---

[5]  As one commentator puts it, the Supreme Court sought to reconcile the "tension between state efforts to design local governments serving particular local constituencies (and arranging systems of local voting . . . accordingly)" and "claims by other local residents that they are sufficiently affected by a local unit's

(continued...)

-18-

retained its vitality. As long as the state treats voters within the same electoral district or governmental unit equally, the right to vote is not compromised. In addition, the state has the right to draw different boundaries for voting purposes—and we generally defer to these delineations—as long as the separate units further reasonable government objectives.

Several conclusions flow from these cases. When a state law discriminates among eligible voters within the *same* electoral district, strict scrutiny review applies, and compelling government interests must justify restrictions of the franchise. For example, strict scrutiny is appropriate where states differentiate among voters in a particular district on the basis of personal characteristics such as wealth, property ownership, or taxpayer status. *See Hill v. Stone*, 421 U.S. 289 (1975) (examining law restricting the vote on a city bond issue to residents who have taxable personal property); *City of Phoenix v. Kolodziejski*, 399 U.S. 204 (1970) (considering law restricting vote in a general obligation bond election to real property taxpayers); *Cipriano v. City of Houma*, 395 U.S. 701 (1969) (per curiam) (analyzing law restricting vote in a municipal revenue bond election to taxpaying residents); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969) (addressing law restricting voting in a school district election to those

---

[5](...continued)
action that they too ought to be enfranchised or equally represented." Richard Briffault, *Who Rules at Home? One Person/One Vote and Local Governments*, 60 U. Chi. L. Rev. 339, 350–51 (1993).

owning or leasing taxable property or having children enrolled in that school district).  Strict scrutiny is also appropriate where a state disqualifies residents living in a federal zone even though they were residents of the state and within state boundaries.  *See Evans v. Cornman*, 398 U.S. 419, 421 (1970) (voters "live within the geographical boundaries of the State of Maryland, and they are treated as state residents").[6]

Importantly, none of these cases held strict scrutiny should apply to voting restrictions based on voters' residency *outside* the relevant electoral district.  Indeed, the cases suggest just the opposite.  The seminal case of *Kramer v. Union Free School District*, for example, while striking down a New York statute that limited voting in school board elections to parents or property owners, expressly noted that New York retained "the power to impose reasonable . . . residency requirements on the availability of the ballot."  395 U.S. at 625.  And in *Hill*, the Court observed that classifications on the basis of residency are exempt from strict scrutiny.  *See* 421 U.S. at 297.  Thus, even non-residents with a substantial

---

[6] Only a narrow line of Supreme Court cases applying rational basis review to voting restrictions discriminating among voters in specialty districts tempers these holdings.  *See Ball v. James*, 451 U.S. 355 (1981) (upholding Arizona agricultural improvement district election wherein only landowners voted and where votes were weighted according to acreage); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719 (1973) (upholding California Water district board elections permitting only property owners to vote and weighting votes by property valuation).  Neither party argues these cases bear on the issue before us.

interest in the governance of a district—say, commuting workers or second-home owners—may be restricted from elections in a district.

While these holdings shed light on the appropriate equal protection framework, none squarely addresses the constitutionality of a statute restricting the franchise in a school district detachment election like the one presented here.

Two cases from the late 1970s, however, support the conclusion that the voting limitations in Utah's school detachment statute are subject to rational basis review. These cases hold that states have considerable leeway in discriminating against voters residing in *different* governmental units or electoral districts even when the outcome of a particular election affects them.

The first case, *Town of Lockport v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259 (1977), concerned a New York voting law that allowed voters from different parts of a county to have a greater voice in strengthening county government. Under the law, county voters could increase the power of the county government by adopting a new charter, but only if *separate* majorities of voters living in the cities and voters living in unincorporated areas outside the cities approved the measure. *See id.* at 260. After a majority of those who lived outside the cities (but a minority of the overall voters in the county) rejected a new county charter, city voters challenged the ability of rural voters effectively to veto the charter changes on equal protection grounds. *See id.* at 262–63.

Reviewing the constitutionality of the New York law, the Supreme Court first recognized that the "single-shot" nature of the referendum procedure was due substantial deference. *Id.* at 266. The procedure was not designed to restrict the ability of voters to select their government representatives. Rather, it was established to provide a one-shot election to determine the structure of local government. "The equal protection principles applicable in gauging the fairness of an election involving the choice of legislative representatives," the Court noted, "are of limited relevance . . . in analyzing the propriety of recognizing distinctive voter interests in a 'single-shot' referendum." *Id.*

Instead, in determining whether equal protection principles permit discrimination between voters in different governmental or electoral units when it comes to referenda, *Lockport* focused on two inquiries: (1) "whether there is a genuine difference in the relevant interests of the groups that the state electoral classification has created;" and, if so, (2) "whether any resulting enhancement of minority voting strength nonetheless amounts to invidious discrimination in violation of the Equal Protection Clause." *Id.* at 268. In finding that New York's law accommodated the distinctive interests of the cities and unincorporated parts of a county—as opposed to their interests as a homogeneous unit—the Court recognized "both the wide discretion the States have in forming and allocating governmental tasks to local subdivisions, and the discrete interests that such local governmental units may have qua units." *Id.* at 269. Given the differing interests

of city and non-city voters in adopting a new county charter, the absence of invidious discrimination, and the presumption of constitutionality entitled to every duly enacted state law, the Supreme Court held equal protection did not invalidate the voting law. *See id.* at 271–73.

The *Lockport* Court did not expressly state it was applying rational basis review. But the wide discretion it applied in analyzing the statute is consistent with no other standard.

In a second case, the Supreme Court again emphasized the leeway states have in treating voters residing in separate governmental units or electoral districts differently. Examining an Alabama statute that excluded residents outside a city from participating in local elections, the Court held a voting scheme constitutional even when the city exercised certain police and other powers over the excluded residents. In *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978), the plaintiffs were residents of the Town of Holt, a small unincorporated community on the outskirts of incorporated Tuscaloosa. *See id.* at 61. Even though the residents lived outside Tuscaloosa's boundaries and were ineligible to vote in Tuscaloosa's elections, Alabama state law subjected them to Tuscaloosa's police and sanitary regulations, the criminal jurisdiction of Tuscaloosa's courts, and Tuscaloosa's power to license businesses, trades, and professions. *See id.* at 61–63. The plaintiffs claimed Tuscaloosa's exercise of extraterritorial

jurisdiction over non-voting residents like them violated the "one person, one vote" mandate of the Equal Protection Clause. *See id.* at 62–63.

*Holt* distinguished the earlier voting limitation cases such as *Kramer*, *Evans*, *Hill*, *Cipriano*, and *City of Phoenix*. The Court noted these earlier cases struck down laws denying the franchise to residents *within* the boundaries of the particular entity exercising police power. *See id.* at 68. While the Supreme Court acknowledged that discriminating among voters within such a governmental unit may merit strict scrutiny, it also recognized that the same unit "may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Id.* at 68–69. "[N]o one would suggest," the *Holt* Court observed, "that nonresidents likely to be affected by this sort of municipal action have a constitutional right to participate in the political processes bringing it about." *Id.* at 69. Nonresidents do not have a right to participate even where internal municipal actions can have "equally dramatic" extraterritorial effects. *Id.* at 70. In explaining its holding, the Court explained that the "line heretofore marked by [our] voting qualifications decisions coincides with the geographical boundary of the governmental unit at issue." *Id.* at 70. Because Holt's residents were not within the boundary of the governmental unit at issue (Tuscaloosa), the case did not fall within the constrictions of the Supreme Court's previous voting rights cases. *See id.*

With this understanding of the scope of the right to vote, the question before the Court became whether the Alabama statute satisfied rational basis review, i.e., whether it had a "rational relationship to [a] legitimate state purpose." *Id.* at 70. In light of the "extraordinarily wide latitude [that States have] in creating various types of political subdivisions and conferring authority upon them," the Alabama law was reasonably related to legitimate governmental interests and thus did not violate equal protection. *Id.* at 71.

While instructive, none of the Supreme Court cases directly addresses the residency and boundary concerns this case presents. Almost all of the cases from lower courts applying these principles, however, support our conclusion that Utah can limit the franchise only to those voters within the detaching district.

### 2. *Lower Court Applications*

Other courts addressing annexation and secession statutes have also deferred to state laws restricting the franchise in local boundary elections.

Two local election boundary decisions are particularly helpful: *Moorman v. Wood*, 504 F. Supp. 467 (E.D. Ky. 1980), and *City of New York v. State*, 557 N.Y.S.2d 914, 916 (N.Y. App. Div.), *aff'd*, 562 N.E.2d 118 (N.Y. 1990). These decisions both upheld state restrictions on voting rights when a portion of an existing political entity sought to detach and either join another jurisdiction or form a new one.

*Moorman* involved several neighborhoods seeking simultaneous detachment from a large city and annexation into two adjoining, smaller cities. *See* 504 F. Supp. at 468. A Kentucky law permitting referenda to accomplish these actions limited voter participation to residents of the detaching neighborhoods. *See id.* Residents of the larger city argued this law violated equal protection "because it does not permit all of the voters of [the larger city] to vote on what amounts to the de-annexation of part of their city, a matter in which they claim a substantial interest." *Id.* The larger city voters argued that, among other impacts, detaching the neighborhoods would substantially impact the larger city's tax base. *See id.*

After reviewing *Hunter*, *Lockport*, *Holt*, and other Supreme Court voting rights decisions, *see id.* at 471–73, the *Moorman* court held that:

> so long as the residents of the affected areas are treated alike within those areas, statutory provisions for a wide variety of voting schemes will be upheld against an equal protection attack, and the vote of one area may be give[n] more weight than that of the other, or the franchise may even be granted to one area and denied to another *if a rational basis exists* for so providing.

*Id.* at 473 (emphasis added) (citing *Hunter*, 207 U.S. 161). The court relied on *Hunter* for the proposition that "these difficult policy problems of local government are matters for the individual states to resolve, and the federal courts should stay out of them if principles of due process and equal protection are observed, as construed in the light of federalism." *Id.* at 477.

The second secession case, *City of New York*, involved a New York statute that created a procedure allowing residents of Staten Island to decide whether the borough should detach from the rest of New York City. The procedure involved two referenda in which the residents of Staten Island would vote on detachment, but did not give other voters in New York City an opportunity to vote on the matter. *See* 557 N.Y.S.2d at 915. The City challenged the state procedures on equal protection grounds, but the state court declined to apply strict scrutiny. Instead, the court held that *Hunter*, *Lockport*, *Holt*, and the Supreme Court's other voting rights decisions provided that "the State can legitimately adopt a geographic classification based upon the boundaries of a proposed new political subdivision to be created if approved by the electorate of the smaller, but significant, separating community." *Id.* at 917. The special interests of Staten Island residents justified limiting the vote to them. *See id.* New York's highest appellate court subsequently affirmed the holding, finding the state's decision to restrict voting to residents of Staten Island was "a reasonable classification based on the distinct interest of that subdivision of the State." 562 N.E.2d at 121.

*Moorman* and *City of New York* considered the precise issue the Utah detachment statute raises—whether, in a voter referendum on a proposed detachment from an existing state political entity, a state may restrict voting to

persons residing in the proposed area of detachment—and found rational basis review to be appropriate.[7]

In addition to these cases, numerous other authorities addressing analogous legal issues support our conclusion that the deferential standard of scrutiny is required. *See, e.g.*, *St. Louis County v. City of Town and Country*, 590 F. Supp. 731 (E.D. Mo. 1984) (upholding an annexation statute providing for a vote of the residents of the annexing city and a separate vote of the residents of the area to be annexed, but allowing the residents of the county outside the area to be annexed to vote); *Hayward v. Edwards*, 456 F. Supp. 1151 (D. S.C. 1977), *aff'd sub nom Hayward v. Clay*, 573 F.2d 187 (4th Cir. 1978) (upholding portion of annexation statute that allowed separate votes of annexing and annexed areas; striking portion of statute which allowed property owners to veto annexation); *Murphy v. Kansas City*, 347 F. Supp. 837 (W.D. Mo. 1970) (upholding annexation statute that allowed residents of annexing city to vote, but permitting residents of area to be annexed to vote); *Bd. of Supervisors v. Local Agency Formation Comm'n*, 838 P.2d 1198 (Cal. 1992) (holding that restricting voter participation in a municipal

---

[7] Secondary authorities support this analysis. *See, e.g.*, Osborne M. Reynolds, Jr., Local Government Law § 70, at 253 & n.4 (2d ed. 2001) (citing *Hunter* and observing that "the validity of [detachment] statutes has been upheld even where the consent of the inhabitants of the disconnected area need not be obtained"); Richard Briffault, *Voting Rights, Home Rule, and Metropolitan Governance*, 92 Colum. L. Rev. 775, 800 (1992) ("[T]he Supreme Court considers the entire issue of local boundary-drawing, with its attendant impact on the scope of the right to vote, to be a matter for political judgment of state legislatures without federal constitutional limitation or guidance.")

incorporation referendum to county residents of area proposed to be incorporated did not violate the Equal Protection Clause); *Givorns v. City of Valley*, 598 So. 2d 1338 (Ala. 1992) (upholding under the rational basis test a statute limiting the franchise to qualified voters living within the boundaries of the area to be annexed); *In re Petition for Detachment of Land from Morrison Comm. Hosp. Dist.*, 741 N.E.2d 683 (Ill. App. Ct. 2000) (holding that limiting voter participation in hospital district detachment referendum to residents of area proposed to be detached did not violate the state's due process clause).[8]

\* \* \*

When viewed together, these cases compel several important conclusions that guide our inquiry. Most notably, states have significant power in allocating voting rights when it comes to the formation and boundaries of their political subdivisions. *See Hunter*, 207 U.S. at 178–79; *Hess*, 513 U.S. at 47. This power is circumscribed, though, in some instances. For example, strict scrutiny applies whenever a state law discriminates among voters for invidious reasons. *See Gomillion*, 364 U.S. at 345; *Lockport*, 430 U.S. at 268. Strict scrutiny also

---

[8] The only exception to this case law is *Fullerton Joint Union High Sch. Dist. v. State Bd. of Educ.*, 654 P.2d 168 (Cal. 1982), in which a plurality applied strict scrutiny to strike down a state law that provided for an election to create a new school district, but limited voting to those residing in the proposed new district. The California Supreme Court revisited *Fullerton* ten years later, and declined to follow the case, noting it was a plurality opinion lacking precedential authority, its reasoning was questionable, and that no other court had cited it. *See Bd. of Supervisors*, 838 P.2d at 1207–10.

applies when state law discriminates among voters in the same governmental unit or electoral district on the basis of a prohibited characteristic such as wealth and property ownership.

But rational basis review applies when a state's voting laws discriminate against those "residing beyond the geographic confines of the governmental entity concerned," *Holt*, 439 U.S. at 68, and "there is a genuine difference in the relevant interests of the groups that the state electoral classification has created," *Lockport*, 430 U.S. at 268.

## C. <u>Rational Basis Review Applies to the Detachment Statute</u>

Applying these principles to the Utah school district detachment statute, we find that rational basis review is the appropriate level of scrutiny.

First, rational basis review accords with *Hunter*'s holding that states have wide discretion in structuring political subdivisions and conferring authority upon them. *See* 207 U.S. 161. The Supreme Court's *Lockport* and *Holt* decisions specifically affirmed the "continue[d] . . . constitutional significance" of that discretion, *Holt*, 439 U.S. at 71, *see also Lockport*, 430 U.S. at 271, and did so in the context of states' authority to determine the boundaries for purposes of voting in local elections. *Holt* emphasized this point, holding, "a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." 439 U.S. at 68–69.

While *Lockport* did not specifically address voting rights in boundary change cases, it did emphasize the "wide discretion the States have in forming and allocating governmental tasks to local subdivisions," and indicated the Court would defer to a state's determination "that the residents of the annexing city and the residents of the area to be annexed formed sufficiently different constituencies with sufficiently different interests." 430 U.S. at 259, 271. In our view, this deference and Utah's discretion in structuring its political subdivisions counsel against finding that strict scrutiny review should apply.[9] *See also* Note, *State Restrictions on Municipal Elections: An Equal Protection Analysis*, 93 Harv. L. Rev. 1491, 1494–95 (1980) (stating the "historic state power to define the boundaries of local communities justified examining such residency restrictions under the rational basis test").

Second, there is no allegation that the Jordan School District detachment discriminates on an invidious basis—e.g., along racial lines—in a manner that would merit strict scrutiny review.[10]

---

[9] We also note that this school district detachment statute is consistent with existing Utah municipal law. For example, the state's municipal incorporation law provides that the voters residing within the boundaries of a proposed new city may participate in the election, while residents from the surrounding county may be excluded. *See* Utah Code Ann. §§ 10-2-109, -111.

[10] A feasibility study that the detaching cities commissioned concluded separation of the Jordan School District's population would not raise division issues relating to social or racial characteristics. The excluded voters do not challenge this conclusion.

Third, the single-shot nature of the referendum supports applying rational basis review. The detachment elections permitted under the Utah statute serve a limited purpose—the alteration of school district boundaries—and leave other governmental decisions to be made at recurring general elections. For this reason, the equal protection principles involved are calibrated less stringently. *See Lockport*, 430 U.S. at 266. So, for example, unlike the residents of the federal enclave in *Evans*, the residents here are not without any voice in the election of the officials who govern their affairs. *See* 398 U.S. at 422–23; *see also Morgan v. City of Florissant*, 147 F.3d 772, 774 (8th Cir. 1998) (noting the "difference in voting jurisprudence between election laws providing for the drawing and redrawing of state political subdivisions, and laws involving the choice of legislative representatives"). Indeed, the Jordan School District voters can and do vote for the county, state, and federal officials who exercise primary control over their day-to-day lives. And even as to their interaction with the detached school district, the voters are not completely without a voice: through their state representatives, they participate directly in the process that provides for the creation (and detachment) of school districts. *See Holt*, 439 U.S. at 77. The nature of the referendum provided for in the Utah statute thus warrants a less scrutinizing standard of review.

Finally, because the Utah school district detachment statute distinguishes among voters having genuinely different relevant interests, rational basis review is appropriate.

The Jordan School District voters strongly contest this final point, arguing they *do* reside in the same governmental unit as those residents allowed to vote, and are equally interested in the detachment issue. They concede a state may limit voting rights to a particular governmental unit, but argue a relevant boundary cannot be drawn where it excludes voters who are as "substantially interested and affected" as those residents who can vote. Aplt. Br. at 15, 31. Citing the financial and administrative consequences as well as the limitation on self-governance accompanying the Jordan School District's division, the excluded voters claim they are as "substantially interested and affected" as those residents of the new district who were permitted to vote. Aplt. Reply Br. at 2, 11. They argue the relevant governmental unit is the entire Jordan School District, and that the Utah statute giving only residents in a proposed new district the right to vote is arbitrary and unconstitutionally narrow.

In essence, the Jordan School District voters contend strict scrutiny review applies whenever a state legislature excludes residents of a governmental unit or electoral district from voting on local government boundary modifications, unless it can demonstrate that the excluded area is substantially less interested in or affected by the proposed modification. Any analysis of voting restrictions based

on residence cannot defer simplistically to political boundaries, they assert, but must begin with a review of the interests of the voters and non-voters in the outcome of the election.

But no major decision has adopted a substantial interest test for elections involving different governmental units or electoral districts. To the contrary, cases from *Holt* to *Lockport* to *City of New York* all affirm that, when states use different local boundaries "to delimit the electorate for purposes of the application of Equal Protection analysis, the state will be given considerable discretion in determining which boundary counts[,] even when it operates to deny some group of affected residents an equally weighted vote, *or any vote at all*." Richard Briffault, *Voting Rights, Home Rule, and Metropolitan Governance*, 92 Colum. L. Rev. 775, 794 (1992) (discussing cases) (emphasis added). That is why courts have always deferred to state electoral schemes regarding annexations that may have substantial economic or cultural consequences on voters excluded from the annexation election. Reynolds, *Local Government Law*, *supra*, at §§ 73, 253 (citing *Holt*).

In *Holt*, for example, the Supreme Court utilized Tuscaloosa's city limits as the relevant political boundary for its equal protection analysis, but it just as easily could have used a boundary extending beyond the city and encompassing Holt. Similarly, in *Lockport*, the Court could have viewed the relevant governmental unit as the entire county. Had it done so, the differently-weighted

votes among those living in the county's cities and rural parts would have presented a thornier equal protection problem. But, given the "genuine difference in the relevant interests of the groups [(i.e., city and non-city voters)] that the state electoral classification has created," *Lockport*, 430 U.S. at 268, the statute's boundary determinations were entitled to deference, *see id.* at 269–72. When read together, *Holt* and *Lockport* thus indicate courts should defer to the voting restrictions states employ when addressing boundary changes.

*Lockport* emphasized, in fact, the "genuine differences" in the relevant interests of the voting groups between which the law discriminated. *Id.* at 268. In deciding on the validity of the state's voting classifications, *Lockport* did not look to whether they discriminated against individuals "substantially interested in and affected by" an election, as the excluded Jordan School District voters maintain. Rather, *Lockport* looked to whether the state could point to a "genuine *difference* in the relevant interests of the groups" in the separate governmental units. *Id.* (emphasis added).

These are two very different standards, and the Jordan School District voters have improperly conflated them. As in *Lockport*, where the New York law at issue rested on the state's identification of the distinctive interests of the cities and towns within a county, *see id.* at 268–69, the detachment law here rests on Utah's identification of the distinctive interests within particular school districts. The excluded voters emphasize that the split will substantially affect them. That

-35-

may be true.  But in the eyes of the state, their interest is still genuinely different from those seeking to form the new district—in the long term, for example, divergent issues may include tax burdens, the use of tax revenues, local control over education, school district size, and allocation of resources.  The voting restrictions Utah has devised as a result of these distinctive interests are "consistent with . . . the wide discretion the States have in forming and allocating governmental tasks to local subdivisions," and these subdivisions' discrete interests.  *Id.* at 269.  The existence of genuine and distinct interests between those in different governmental units or electoral districts counsels against our applying strict scrutiny.

Finally, the excluded voters forget that the residents disenfranchised in *Holt* were every bit as "substantially affected" as those in *Kramer*, *Cipriano*, *City of Phoenix*, or *Hill*.  The Supreme Court upheld the Alabama law at issue in *Holt,* despite the fact the statute subjected Holt's residents to Tuscaloosa's police and sanitary regulations, criminal jurisdiction, and power to license businesses, trades, and professions.  *See* 439 U.S. at 61–63.  But because the issue in *Holt* dealt with discriminating between voters in different governmental units, the implications for substantially affected excluded voters could be sidestepped.

At the very least, this suggests the principle from *Cipriano*, *City of Phoenix*, and other earlier cases—disenfranchisement of those affected by a local government's action triggers strict scrutiny—"only applies *within that*

*government's borders*." Briffault, *Who Rules at Home?*, *supra* at 387 (emphasis added). It also suggests that states should be given much leeway in determining the relevant boundaries for voting.

*   *   *

In conclusion, the Supreme Court has left a state's ability to change the boundaries of its local governmental entities largely undisturbed. In the equal protection context, the question is not whether there will be extraterritorial effects or what the magnitude of those effects will be. The question is whether the distinctions were made based on governmental units or electoral districts wherein the voters had genuinely different interests.

The statutory scheme challenged in this case is a residency restriction based on relevant electoral criteria. Utah made a determination that the geographical areas that would comprise the new school district would be most directly affected, and thus provided them with the franchise. All the residents of that political entity were allowed to vote. While it may have been better for the legislature to expand the electoral district to include all residents of the existing district, this is a question best left to the legislature, not a federal court. We therefore find rational basis review applies here.

### D. The Detachment Statute Furthers Legitimate State Interests

Having determined that rational basis review applies, we consider whether Utah's law satisfies such review.

A rational basis equal protection analysis is highly deferential to state legislatures, and we accord a strong presumption of validity to laws that neither involve fundamental rights nor proceed along suspect lines. *See Heller v. Doe*, 509 U.S. 312, 319–21 (1993). Rational basis review is not a license for us "to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Instead, we uphold a statute if there is any "reasonably conceivable state of facts" that could provide for its basis, *id.*, and will only strike the law down if the state's classification "rests on grounds *wholly irrelevant* to the achievement of the State's objective," *Holt*, 439 U.S. at 71 (quotation omitted) (emphasis added).

We need not wrestle long with whether the Utah detachment statute satisfies rational basis review. The detaching cities provide a litany of justifications for the law, including, among many others, supporting the creation of community-based school districts, encouraging the creation of smaller school districts more responsive to the needs of students and parents, and promoting the localized use of tax revenues so that taxes collected within a local area are used for education in the same area. These justifications attest to the statute's constitutionality.

The excluded voters seize on this last justification, and assert that localized use of tax revenues among the wealthier eastern cities is the actual reason for detaching from the Jordan School District. Even if this were the only rational

-38-

basis for the detachment statute, though, the goal of localizing property tax revenues is sufficiently rational to uphold the constitutionality of legislation. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40, 49–50 (1973).

Nor are we persuaded by the argument that inconsistent methods of detachment in the statute—at times requiring a vote of all residents in the existing district and at times requiring only a vote in the new district—means the statute lacks a rational basis. What may or may not occur under other statutory provisions has no bearing on whether the state has legitimately limited the franchise to the relevant class of voters under the statute.

Even if the comparison to other statutory provisions were relevant to the constitutionality of the vote being challenged, there are distinct rational differences in the relevant political entities. For example, in citizen and school board initiatives to create a new district, allowing the entire school district to vote makes the franchise co-extensive with the political entity whose officials sponsored the proposal. Thus, the relevant jurisdiction is the entire school district.

But when a subset of cities initiates the creation of a new school district via interlocal agreement, the cities are seeking to create a new, smaller district that is co-extensive with their political boundaries. Limiting the franchise to those in the initiating cities allows the citizens to review the action of their elected officials and confirm their agreement and dedication to the new district. States do

not act irrationally in concluding that voters outside the new district should not have a veto power over the election. As we previously found, states have the authority and discretion to recognize that these different interests determine the relevant political boundaries for voting purposes.

We conclude the Utah detachment statute withstands rational basis review. The district court correctly decided there were no genuine issues of material fact and thus properly granted summary judgment in favor of the detaching cities.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.